Rhonda Lee BIBBO, et al., Plaintiffs,

v.

James MULHERN and Massachusetts Bay Transportation Authority, Defendants.

Richard E. PRUNEAU, Plaintiff,

v.

Frank DONAHUE, et al., Defendants.

Civ. A. Nos. 84–1414–Y, 84–2047–Y.

United States District Court, D. Massachusetts.

Nov. 8, 1985.

J. Albert Johnson, Johnson, Mee & May, Boston, Mass., for plaintiffs No. 84–1414–Y.

Paul V. Buckley, Buckley, Haight, Muldoon, Jubinville & Gilligan, Milton, Mass., Sandra L. Hautanen, Warner & Stackpole, Boston, Mass., for defendants No. 84–1414–Y.

Frank DiMaria, Law Offices of Robert Boudreau, East Pepperell, Mass., for plaintiffs No. 84–2047–Y.

Alfred L. Daniels, Andover, Mass., Russell F. Conn, Burns & Levinson, Boston, Mass., Johnson, Gammon, Silverman, Harr Dalton, Byrne, Andover, Michael DeMarco, Murphy & Mitchell, Boston, Mass., for defendants No. 84–2047–Y.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

These cases are before the Court on the motions for summary judgment by the individual and municipal defendants. Case No. 84–1414–Y (hereinafter the "Bibbo case") arises out of the fatal shooting of Timothy Bibbo on May 28, 1982 by Officer James Mulhern of the Massachusetts Bay Transportation Authority (hereinafter the "Authority") police. Plaintiff Rhonda Lee Bibbo brought suit under 42 U.S.C. § 1983[1] and state tort law on behalf of herself and her daughter, and as administratrix of her husband's estate. Case No. 84–2047–Y (hereinafter the "Pruneau case") arises out of the alleged beating of Richard Pruneau on July 5, 1981 by several officers of the Andover police force. Mr. Pruneau has brought suit under § 1983 along with various state tort causes of action. Jurisdiction exists in each case under 28 U.S.C. § 1343(3) and the pendent claim doctrine of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Because the legal principles that animate the decisions on these motions are common to both cases, the Court has found it prudent and expedient to issue this joint memorandum and order.

### I. *Factual Background*

Viewing the record that is now before the Court in the light most favorable to the party opposing the motion, and indulging all inferences favorable to that party, *Emery v. Merrimack Valley Wood Products, Inc.*, 701 F.2d 985, 986 (1st Cir.1983), the following facts could reasonably be found in each case.[2]

### A. The *Bibbo* Case

On May 27, 1982 Officer James Mulhern of the Authority police worked his scheduled shift from 3:30 p.m. to 11:30 p.m. Officer Mulhern then proceeded to the Maverick Square subway station in East Boston where he was scheduled to work a "painter's detail" from 12:00 a.m. to 6:00 a.m. the morning of May 28th. Officer Mulhern's duties at the Maverick Station were to patrol the area while an Authority paint crew was working, and to protect the crew and the van out of which they worked.

At about 2:30 a.m. Officer Mulhern saw plaintiff's decedent, Timothy Bibbo, and Louis Sorrentino try to enter Joey D's, a Maverick Square establishment. According to Sorrentino, he and Bibbo were looking for a place to go to the bathroom. After finding Joey D's locked, Sorrentino and Bibbo walked towards the area of the Maverick Square station, specifically towards the painters' van that was parked next to the station. Again according to Sorrentino, their purpose was to find a convenient spot to urinate. Officer Mul-

---

1. Plaintiffs in both cases also allege violations of §§ 1985 and 1986. In neither case, however, is there any allegation of a class based invidiously discriminatory motive. Therefore, these claims are without merit. *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

2. In reciting the facts of a case for the purposes of a motion for summary judgment the Court expresses no opinion as to the ability of either party to prove such facts at trial, or as to the credibility of the evidence.

hern observed them walking towards the van.

What happened next is in great dispute. Officer Mulhern claims that after observing Sorrentino break into the passenger side door of the van, he radioed the Authority dispatcher for assistance and proceeded towards the van. At the van he identified himself as a police officer and told Sorrentino he was under arrest. At that point, according to this version of the events, Sorrentino attacked Officer Mulhern, punching him, kicking him and stabbing him in the eye with a broken bottle. In the meantime, Bibbo and at least one other person had joined Sorrentino and had wrestled Officer Mulhern to the ground. Officer Mulhern then felt Sorrentino attempt to pull his gun out of the holster, but was able to draw the gun himself. As Officer Mulhern drew his weapon he saw Bibbo standing over him about to hit him with his service baton. In self defense Officer Mulhern fired four times at Bibbo. One shot struck him in the back, killing him.

Mrs. Bibbo's witnesses, Sorrentino and one Sheila Smith, present a much different picture of the night of May 28, 1982. According to this version of events, Sorrentino and Bibbo were only fooling around with the ladders on the side of the van, doing "pull ups" and so on. Officer Mulhern then approached them from behind and, without warning, pushed Sorrentino to the ground and began assaulting Bibbo. When Sorrentino pleaded with Mulhern to let Bibbo go, he allegedly responded, "I am going to kill you next." At the time, Sorrentino did not know Mulhern was a police officer because Mulhern was wearing a black windbreaker which bore no police insignia. Sorrentino then called for help to one of his friends waiting in a car, and tackled Mulhern in an effort to aid Bibbo. While wrestling with Mulhern on the ground, Sorrentino's elbow bumped the officer's gun. Realizing that their assailant was armed, Bibbo, Sorrentino, and a friend who had joined them, began to run down the street away from the station. Officer Mulhern then got off the ground, positioned himself in a crouched position with

both hands out in front of him holding his pistol, and fired his weapon four times.

Timothy Bibbo was found lying 106 paces from the scene of the initial altercation with a gunshot wound in the left side of his back. Officer Mulhern was treated at a hospital for a concussion, facial and head lacerations, contusions and bruises.

### B. The *Pruneau* Case

On July 4, 1981 Richard Pruneau hosted a family barbeque at his home in Andover, Massachusetts. Mr. Pruneau admits to drinking five beers throughout the day, but claims that he was not affected by his consumption of alcohol. At about 11:45 p.m. Mr. Pruneau's brother Dennis left the party with his wife and children for their home in Manchester, New Hampshire. Approximately fifteen minutes later Dennis returned to Mr. Pruneau's home complaining of car trouble and asking for tools and assistance. Mr. Pruneau, his brother Dennis, and a friend named Paul Murphy then drove back to the disabled automobile. The three opened the hood and attempted to repair the problem. While working on the car they used tools which made slight tapping noises, and occasionally touched the horn mechanism, resulting in a few short blasts from the horn.

At this point Officer Frank Donahue drove up to the scene. After stopping his car and opening his door Donahue yelled, "What is with the f_____ horn?" Pruneau replied that he was fixing the car and that if Donahue was not there to help he should get out of there. According to Pruneau, Donahue then told him that he would "teach me a lesson."

A short time later, as Mr. Pruneau was attempting to walk home, Andover police cruisers arrived with their lights flashing. As Officers Arthur Rickey and Donald Patullo got out of one of the cars, Pruneau began walking towards them. At that moment Mr. Pruneau heard Officer Donahue say "That is the son of a bitch," and then Donahue tackled Pruneau. Mr. Pruneau asked the other officers to help him get Donahue off him, not knowing at the time

that Donahue was a policeman. A scuffle ensued and Officers Rickey and Patullo wrestled Pruneau to the hood of the cruiser, handcuffing him in a way he claims caused great pain, and placing him under arrest. During this time Officers Burke and Sunderland, who were aware of what was transpiring, prevented Paul Murphy and Dennis Pruneau from going to aid the plaintiff.

Pruneau was placed in the back seat of a police cruiser in which Officers Grant and Houlihan were in the front seat. Officer Donahue then came and sat next to Pruneau in the back seat. Telling him again that he would teach him a lesson, Donahue allegedly began to beat Pruneau about the head, chest, abdomen, and groin. Officer Grant responded to Pruneau's pleas for help by asking, "What's the matter Frank, can't you shut the son of a bitch up?"

Officer Donahue replied, "I'll shut him up."

Upon arriving at the Andover police station, Pruneau met Lieutenant Belbin, and Sergeant Mooers, the shift commander (described in the complaint as Raymond Morse). The other officers who had been at the scene of the arrest continued to verbally harass Mr. Pruneau, calling him a faggot and laughing at him. Donahue occasionally lunged at Pruneau in an apparent attempt to frighten him. Belbin and Mooers did nothing to prevent this verbal harassment. Upon learning that Pruneau was to be charged with disturbing the peace, Belbin is alleged to have said, "You guys better have something more on this guy." Eventually Pruneau was charged with assault and battery by means of a dangerous weapon on a police officer, a charge as to which he later was acquitted.

After being released from custody Mr. Pruneau was treated for cuts on his wrists and chest, bruises on his arms, bruises and cuts along his stomach, and a bruise on his head. He also claims to be suffering psychological injury.

## II. § 1983 Injuries

In any case brought under § 1983 alleging a denial of substantive due process[3] the first inquiry must be "whether the plaintiff has been deprived of a right 'secured by the constitution and laws' " of the United States. *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). The question for the Court is whether the allegations of the complaint describe a "constitutional tort actionable under § 1983." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981). This question is separate and apart from any inquiry into whether there has been an invasion of some interest protected by state tort law. The decisions of the Supreme Court make clear that § 1983 is not to be read as simply a 'font of tort law to be superimposed upon whatever systems may already be administered by the court." *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976); *see also Baker v. McCollan*, 443 U.S. at 146, 99 S.Ct. at 2695 ("§ 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort law principles"). This is true even though the wrong may have been committed by an official clearly acting under color of state law. *Schiller v. Strangis*, 540 F.Supp. 605, 616 (D.Mass.1982).

Where the plaintiff's allegations are of improper and excessive use of force by the police in effecting an arrest, the inquiry into whether the allegations describe a constitutional tort focuses on the reasonableness of the "seizure" viewed under the

---

**3.** A distinction must always be made between claimed denials of procedural due process and substantive due process. *Holland v. Breen*, No. 85–1050–Y slip op. at 5 (D.Mass. October 30, 1985). In the former case the Court focuses on the adequacy of alternative state remedies, while in the latter case the Court's inquiry is into the nature of the injury. If the injury is one that appropriately can be described as a constitutional tort, then the existence of the alternative state remedy becomes irrelevant (see discussion below), and the federal court will adjudicate the claim.

totality of the circumstances. *Tennessee v. Garner,* — U.S. ——, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985). Thus, while it is established in this circuit that "in appropriate circumstances, the use of excessive force or violence by law enforcement personnel violates the victim's constitutional rights," *Landrigan v. City of Warwick,* 628 F.2d 736, 741 (1st Cir.1980), it is also true that "not all unlawful force used by state law enforcement personnel rises to the level of a constitutional violations." *Meola v. Machado,* 602 F.Supp. 3, 6 (D.Mass.1984). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates [the Constitution]." *Johnson v. Glick,* 481 F.2d 1028, 1033, *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *see also, City of Oklahoma City v. Tuttle,* — U.S. ——, 105 S.Ct. 2427, 2433 n. 4, 85 L.Ed.2d 791 ("This Court has never held that every instance of use of unreasonable force in effecting an arrest constitutes a violation of the Fourth Amendment.").

The use by our Court of Appeals of the words "appropriate" and "excessive" makes clear that the determination whether the alleged conduct rises to the level of a constitutional tort involves an essentially *ad hoc* inquiry. In attempting to identify the proper "standard of severity of an intrusion required to establish a violation of the rights protected under the rubric of substantive due process," *Ramos v. Gallo,* 596 F.Supp. 833, 838 (D.Mass.1984), this Court can find guidance from the insights of those who have earlier considered this problem. In an oft quoted discussion, Judge Friendly has said that:

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflict-

ed, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.[4] *Johnson v. Glick,* 481 F.2d at 1033. In addition, Judge Keeton has pointed out that the severity of the force used and the injury inflicted "are not to be viewed in isolation, rather are to be considered in relation to the need for the use of force and in light of the purpose for which the force was used." *Schiller v. Strangis,* 540 F.Supp. at 617. Although the standard for determining whether the constitutional line has been crossed remains inherently vague, the relevant factors identified by Judges Friendly and Keeton provide the guidance necessary to determine, in the cases now before the Court, whether the injuries complained of are actionable under § 1983.

### A. The *Bibbo* Case

Without expressing any opinion as to the credibility of the evidence, the Court rules that the evidence adduced by Mrs. Bibbo, viewed in the light most favorable to her, undoubtedly could support a finding that Timothy Bibbo's constitutional rights have been violated. The testimony of Sorrentino and Smith suggests a situation in which force, although unneeded, was wantonly applied. To deprive a man of his life under such circumstances plainly violates rights secured by the Fourth and Fourteenth Amendments.

 The only potential issue as to the validity of Mr. Bibbo's claim is whether it survives his death. Although the statute itself is silent as to survival actions, the Court should apply the state rules on the right to survivorship to the extent they are not inconsistent with the federal policies underlying § 1983. *Brazier v. Cherry,* 293 F.2d 401, 405 (5th Cir.1961), *cert. denied,* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); *Bell v. City of Milwaukee,* 746 F.2d

---

**4.** The First Circuit has upheld jury instructions based on Judge Friendly's opinion in *Johnson.* The court noted, however, that the charge was "open to criticism on the ground that it did not expressly require a finding that the force used was shocking or violative of universal standards of decency." *Furtado v. Bishop,* 604 F.2d 80, 95 (1st Cir.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980).

1205, 1234 (7th Cir.1984); *see also, Jones v. Hildenbrant,* 432 U.S. 183, 190, 97 S.Ct. 2283, 2287, 53 L.Ed.2d 209 (1977) (White, J. dissenting). Under Massachusetts law, Mr. Bibbo's claims would survive his death and are properly brought by his administratrix. *See* Mass.Gen.Laws ch. 229 § 2. This same analysis establishes that the claims by Mrs. Bibbo on behalf of herself and her daughter, for the wrongful death of a husband and a father, describe conduct actionable under § 1983.

### B. The *Pruneau* Case

■ Mr. Pruneau alleges that the individual officers[5] violated his constitutional rights in the following ways:

1) The physical beating of Pruneau by Officer Donahue, and the brutality attendant the arrest by Officers Rickey and Patullo.

2) The failure of the other officers at the scene of the arrest to prevent this physical assault.

3) The verbal harassment and threats by the officers at the police station.

4) The failure of Officers Belbin and Mooers to prevent the verbal harassment at the police station.

It is useful to distinguish between Pruneau's claims of physical abuse and verbal harassment. The Court has no difficulty finding that, viewed in the light most favorable to Mr. Pruneau, the evidence adduced tends to show brutal conduct that, if proven, would be actionable under § 1983. Although Mr. Pruneau's injuries do not appear to be severe or permanent, they must be considered in light of the purpose and the need for the force applied. The trier of fact could find that Mr. Pruneau was punished for showing what was, in Officer Donahue's mind, too little respect for the law. There are controverted facts regarding whether there was any need for force at all in this situation. Thus, the claims

against Officer Donahue amount to "substantially more than a bare case of unprivileged interference with interests protected under state tort law," *Schiller v. Strangis,* 540 F.Supp. at 617, and as such are cognizable as constitutional torts under § 1983.

■ The claims against the other officers present at the scene, based on their failure to prevent the beating, stand on a similar footing. Quite aside from the question of whether an officer is under a duty to come to the aid of one who is suffering abuse at the hands of a fellow officer, *Ware v. Reed,* 709 F.2d 345, 353 (5th Cir. 1983); *Byrd v. Brishke,* 466 F.2d 6, 11 (7th Cir.1972), Mr. Pruneau alleges here that Donahue's colleagues actively or implicitly encouraged the illegal use of force. The disputed issues of fact surrounding this question alone are enough to overcome these defendants' motions for summary judgment.

■ The claims of verbal abuse and harassment present a somewhat thornier problem. Certainly being humiliated, denigrated and frightened by the local police is an experience nobody should have to endure. Under most circumstances such behavior by the police likely is actionable under state tort law. The Fourteenth Amendment does not protect against all intrusions on one's peace of mind, however. Despicable and wrongful as it may have been, the verbal abuse of Mr. Pruneau in the station house, falling short of physical force as it did, was not the kind of conduct for which the due process clause provides redress, and instead a remedy must be sought under state tort law.[6]

Mr. Pruneau's claim against Sergeant Mooers is based solely on the fact that, "some of the time" Pruneau was being verbally harassed at the station house, Mooers was present and failed to prevent the harassment from continuing. Pruneau admits in his deposition that Mooers did not

---

**5.** Municipal liability is discussed in Part IV below.

**6.** The Court should not be understood to hold that under no circumstances will verbal abuse

or harassment violate the Civil Rights Act. For example, abuse that was racially motivated or continued over an extended period of time might well involve a constitutional tort.

strike or assault him in any way. Given that the Court has previously ruled that the verbal abuse at the police station did not cause any injury cognizable under § 1983, then by the same reasoning Sergeant Mooers is not liable under § 1983 for his failure to prevent the harassment.

 Were it not for one fact, this same analysis would apply to Lieutenant Belbin, who also did not personally participate in the use of physical force. But there is one additional allegation facing Belbin. In his answers to Officer Donahue's interrogatories, Mr. Pruneau alleges that Belbin told the arresting officers that "you guys better have something more on this guy [than simply a disturbing the peace charge]." While this statement is equivocal at best, on the present record the finder of fact could warrantably infer from this statement that Belbin was suggesting that the other officers should fabricate charges against Pruneau in order to cover up their illegal behavior. When a police officer fraudulently charges a citizen, and forces that citizen to stand trial for crimes of which the officer knows he is innocent, that officer's conduct most certainly offends all that is meant by "due process of law." *Cf. Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980) (we "assume without deciding that such an object [conspiracy to cover up police brutality], sufficiently advanced, could have amounted to an actionable deprivation of federally protected rights.") In a very real sense the officer's corrupt scheme can scar the citizen as much as would ever be possible with the fist or billyclub. Such conduct is especially egregious when one in a supervisory position encourages those who would look to him for guidance to participate in such a lawless plan. For this reason the Court rules that Mr. Pruneau should have the opportunity to prove at trial that Lieutenant Belbin and other officers participated in a plan to file charges they knew to be false and unfounded.

### III. *Good Faith Immunity Under § 1983*

While the law does not permit or condone the unlawful use of force by the police,

neither does it require of them perfection, nor cool and detached reflection when the situation does not permit. Towards this end the courts have long recognized a good faith immunity for police conduct that, although unlawful, was not unreasonable under the circumstances. *See e.g., Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). The obvious purpose of such an immunity is to give officers the freedom to exercise the discretion necessary to a proper discharge of their duties without undue fear of incurring personal liability. The Supreme Court's most recent formulation of the good faith immunity standard is set out in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). There the Court said that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. Although *Harlow* involved the liability of Presidential aides, the First Circuit has adopted the objective test of *Harlow* as the correct approach in § 1983 cases involving police officers. *Briggs v. Malley*, 748 F.2d 715, 718 (1st Cir.1984) *cert. granted*, — U.S. ——, 105 S.Ct. 2654, 86 L.Ed.2d 271 (1985); *Voutour v. Vitale*, 761 F.2d 812, 818 (1st Cir.1985).

In the *Bibbo* case Officer Mulhern asserts that he is entitled to a finding that his conduct was, as matter of law, shielded from liability under the good faith immunity doctrine. In so asserting he relies heavily on *Floyd v. Farrel*, 765 F.2d 1 (1st Cir.1985), just recently decided by our Court of Appeals. Officer Mulhern's reliance is misplaced.

In *Floyd*, a New Hampshire state trooper arrested the plaintiff for receiving stolen property. The trooper had stopped the plaintiff for driving with a broken headlight, but later learned that the car was stolen and that there was a warrant out for

the arrest of the plaintiff's father in connection with the theft. The trooper also determined that the plaintiff was on parole. When asked whether he knew the car was stolen, the plaintiff replied that his father "probably dumped it in New Hampshire. It was getting too hot." At that point the plaintiff was arrested and jailed. After a court found no probable cause for a felony charge, the plaintiff pleaded guilty to the offense of driving without a license and was released. The plaintiff then brought suit under § 1983 alleging that the arresting officer had no probable cause for arrest. The district court denied the trooper's motion for summary judgment holding that "the issue of qualified immunity is almost universally one which presents a question of fact to be determined by the trier of fact." The Court of Appeals reversed, finding that the district court's statement was in error, and holding that an officer's "qualified immunity is pierced only if there clearly is no probable cause at the time the arrest was made." 765 F.2d at 5-6.

Borrowing from the language of *Floyd*, Officer Mulhern asserts that "the defense of qualified immunity is pierced only if there *clearly* were no grounds to act as the defendant did." The Court simply cannot accept this as a correct statement of the law. To suggest that because an arresting officer is immune so long as there is no clear absence of probable cause to arrest, mandates that an officer who fires his weapon is immune unless there clearly is no reason to shoot, makes an intellectual leap that ignores the significant differences between being arrested and being shot.

▮ The fact of the matter is that there are disputed issues of fact as to what information was available to Officer Mulhern when he fired his gun, and as to whether another officer having the same information Mulhern had would reasonably have come to the conclusion that deadly force was required. Accordingly, this is not a case where summary judgment would be appropriate on the grounds of good faith immunity.

IV. *Municipal Liability*

▮ In the seminal case of *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that while local governing bodies are "persons," and therefore can be sued directly under § 1983, such bodies "cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. at 691, 98 S.Ct. at 2036. Instead, liability against municipalities should be imposed only when a governmental policy or custom "is responsible for a deprivation of rights protected by the Constitution." 436 U.S. at 690 and 694, 98 S.Ct. at 2035 and 2037. Since *Monell* the Court has emphasized that the "subjects or causes to be subjected" language of the statute requires that the governmental policy must be so tied to the challenged acts that it can be said to be the "moving force of the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981); *see also, City of Oklahoma City v. Tuttle*, — U.S. —, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) ("at the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."). Thus, a plaintiff who seeks to hold a municipality liable under § 1983 must prove "(1) a policy (2) of the city's policymaker (3) that caused (4) the plaintiff to be subjected to a deprivation of constitutional right." *Grandstaff v. City of Borger, Tx.*, 767 F.2d 161 (5th Cir.1985); *cf. Forand v. O'Brien*, 602 F.Supp. 1182, 1185 (D.Mass.1985).

Last term in *Tuttle*, the Supreme Court had occasion to discuss the amount of proof necessary to satisfy the *Monell* standard. In *Tuttle* the respondent's decedent had been shot to death by an Oklahoma City police officer. She brought suit against the officer and the city under § 1983 alleging, *inter alia*, that the city was responsible for the death because it had inadequately trained its officers. The district court instructed the jury on the theory that the jury could "infer" a policy

of inadequate training from "a single unusually excessive use of force." The court of appeals upheld the verdict. 105 S.Ct. at 2435.

The Supreme Court reversed, the plurality opinion holding that "proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing unconstitutional municipal policy." 105 S.Ct. at 2436. Because the "policy" in question there, inadequate training, was not itself unconstitutional, the plurality went on to say that "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." 105 S.Ct. at 2436 (footnotes omitted).

### A. The *Bibbo* Case

Most of Mrs. Bibbo's claims against the Authority[7] are unfounded. For example, Mrs. Bibbo argues that the Authority supported, condoned or acquiesced in a policy of allowing excessive police violence by promulgating Rule 10 of the Authority's Rules and Regulations. Rule 10 requires that when a disturbance occurs a patrolman "shall proceed as quickly as possible to the scene of a disturbance . . . and take whatever action is deemed necessary." According to Mrs. Bibbo, this rule amounts to deliberate indifference by the Authority to the civil rights of the citizens of Massachusetts. The theory apparently is that the rule encourages recklessness. The Court disagrees, and rules that, as matter of law, the policy embodied in Rule 10 violated no constitutional rights of the plaintiffs. Indeed, a rule which required anything less than rapid response to developing trouble would be far more likely to implicate the civil rights of the citizenry than does Rule 10.

Similarly without substance is the charge that the Authority has been grossly negligent in training its police officers. The record is completely lacking of any evidence which suggests that the Authority deviated from accepted standards of training. Officer Mulhern received basic police training at the Boston Police Academy shortly before beginning his employment with the Authority police in 1974. He received firearms training during his basic police training, and continually on an annual or biennial basis through the time of the events in question here. In fact, he had qualified as a sharpshooter at a firearms training class approximately a month before the shooting. Prior to the time of the shooting Officer Mulhern had received specialized training in criminal law, self-defense, patrol proceedings, and powers of arrest. Officer Mulhern's training rests in sharp contrast to that of the officer in *Voutour v. Vitale,* 761 F.2d at 820, where the court denied the town's motion for summary judgment. There the town had not provided the officer with either basic police training or firearms training prior to the time of the challenged shooting. This Court is prepared to say that, on the record before it, the training of Officer Mulhern, as matter of law, was not grossly negligent.

Two of Mrs. Bibbo's claims do give the Court pause, however. The first is that the Authority's policy of "allowing officers to work back to back shifts, without rest and without being properly checked for fatigue" constitutes gross negligence and deliberate indifference to the rights of Massachusetts citizens. This claim apparently is one of first impression. It does not stretch the imagination too far to believe that Officer Mulhern might have reacted differently had he not already worked ten hours. There certainly is a *possibility* that the policy of allowing double shifts contributed in some way to Timothy Bibbo's death. A mere possibility is not the appro-

---

**7.** The parties agree that the Authority is a political subdivision of the states. *See* Mass.Gen. Laws ch. 161A § 2.

priate standard for imposing liability against the Authority, however. Under *Tuttle* there must be "considerably more proof than the single incident ... to establish ... the requisite fault on the part of the municipality."' 105 S.Ct. at 2436. Here, that proof, or evidence that the plaintiff could provide such proof at trial, is missing. There is no evidence of other incidents of brutality by Authority police, much less that such brutality was caused by fatigue. Moreover, Mrs. Bibbo has adduced no evidence that scheduling double shifts deviates from any recognized standard of care for municipal police department. On this particular record, therefore, the Court rules that, as matter of law, the policy of allowing double shifts is not shown to violate the Bibbos' constitutional rights.

The other significant allegation made by Mrs. Bibbo is that the Authority's policy on the use of deadly force in apprehending a fleeing suspect is unconstitutional. As a preliminary matter, the Court notes that there appears to be a disputed issue of fact as to exactly what was the Authority's policy. Mrs. Bibbo proffers a document she identifies as Rule 15 of the Authority's Rules and Regulations. This rule allows an officer to use deadly force:

> To apprehend perpetrators who, in the course of their crime threatened the use of deadly force, *or* if the officer believes there is a substantial risk that the person whose arrest is sought will cause death or serious bodily harm if his apprehension is delayed. (emphasis added).

The Authority, on the other hand, submits a document entitled "Rules and Regulations—Deadly Force." According to this document the use of deadly force is permitted only:

> To apprehend a fleeing felon when the officer knows, as a virtual certainty, (1) that the suspect has committed a felony during the commission of which he inflicted or threatened to inflict deadly force upon the victim, *and* (2) that there is substantial risk that the felon in ques-

tion will cause death or great bodily injury if his apprehension is delayed.

Pursuant to its duty to view the evidence in the light most favorable to the non-moving party, the Court will assume that Rule 15 as proffered by Mrs. Bibbo is the correct statement of Authority policy. This is more favorable to her because Rule 15, by its use of the disjunctive "or" instead of the conjunctive "and," expands the range of situations where the use of deadly force by Authority officers is permissible.

The Supreme Court addressed the constitutionality of using deadly force to apprehend a fleeing felon in *Tennessee v. Garner*, —— U.S. ——, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In *Garner* the plaintiff's decedent was shot and killed as he fled the scene of a night burglary. At the time the officer fired the fatal shot he was "reasonably sure" that the suspect was unarmed. The officer called out "Halt. Police," and when the suspect began to scale a fence to escape, the officer shot him. The officer was acting pursuant to a Tennessee statute and police department policy. The statute provided that "if after notice of intention to arrest the defendant, he either flees or forcibly resists, the officer may use all the necessary means to effect the arrest." 105 S.Ct. at 1698. The police policy was "slightly more restrictive." 105 S.Ct. at 1698. The father brought suit under § 1983. The Supreme Court granted certiorari to consider the constitutionality of the Tennessee statute.

The Supreme Court began its discussion by noting that "the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 105 S.Ct. at 1699. The Court then held that although the Tennessee statute was not unconstitutional on its face, it was unconstitutional insofar as it authorized the use of deadly force against a fleeing felon who "poses no immediate threat to the officer and no threat to others." 105 S.Ct. at 1701. This holding was based on the Court's balancing of the nature and quality of the "seizure" against the governmental interest in apprehending the sus-

pect. The Court concluded that unless the officer had "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others," the balance weighs against the use of deadly force. 105 S.Ct. at 1701. Where there is probable cause to believe the suspect poses such a threat, however, then "deadly force may be used if necessary to prevent escape, *and if, where feasible, some warning has been given*." 105 S.Ct. at 1701 (emphasis added).

As far as it goes, the Authority's Rule 15 fits within the *Garner* guidelines. The rule permits the use of deadly force against a fleeing suspect who either has threatened or used force in the commission of a crime, or is likely to cause death or serious bodily harm if he is not immediately apprehended. Deadly force is constitutional in both of these situations under the letter and spirit of *Garner*. The problem is that Rule 15 may not go far enough in that it does not require an officer to first order the fleeing suspect to halt. The *Garner* court indicated, in the language emphasized above, that a verbal warning should be given before deadly force is used. Other than this one line, however, the Supreme Court did not devote any discussion to the need for a warning. Nonetheless, the overall reasoning of the opinion suggests that giving the requisite warning is a significant factor in judging the reasonableness of the use of deadly force. Early in the opinion Justice White noted that not only is the intrusiveness to the individual of a seizure by means of deadly force "unmatched," but such a seizure is also self defeating to the government's interest because it often ensures that the criminal justice system will not be set in motion. 105 S.Ct. at 1700. Given that both the individual's and the government's interest is better served if deadly force is avoided, it seems likely that the Supreme Court intended the warning requirement to be an essential factor in judging the constitutionality of the use of deadly force. The constitution requires

that deadly force be used as a last resort. Accordingly, this Court is not prepared to rule that Rule 15 was constitutional as matter of law.

That said, it should be noted that Mrs. Bibbo's § 1983 claim against the Authority is far from proved. The Authority can be held liable only if Rule 15 is causally related to Timothy Bibbo's death in a constitutionally impermissible way. Thus, for example, if the finder of fact determines that it would not have been feasible for Officer Mulhern to give a warning under the circumstances, then the failure of Rule 15 to require a warning where feasible would not be the "moving force" behind any injury. Similarly, if Officer Mulhern was acting in violation of Rule 15 at the time he shot Bibbo, then too the Authority would not be liable.

### B. The *Pruneau* Case

Mr. Pruneau's suit was brought against the Andover Selectmen in their individual and official capacities. A review of the record makes clear, however, that the only plausible basis of liability against any of the selectmen is in their official capacity. None of them personally participated in the alleged civil rights violations, and all have submitted affidavits, which are uncontroverted, that they have no role in directly supervising the Andover police force or any of its employees.[8]

Because "official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent," *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035, the Supreme Court has held that a judgment against a public servant in his official capacity imposes liability on the city itself. *Brandon v. Holt*, —— U.S. ——, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985). The logical extension of this principle is that official capacity claims brought under § 1983 should be judged by the same standards that would be applicable had the suit been brought directly against the public

---

**8.** In addition, Selectmen Dalton's affidavit represents that he was not elected until after the events in question here. For this reason his

motion for summary judgment will be allowed as to all counts.

fisc. *Scarpa v. Murphy,* 624 F.Supp. 33, 36 (D.Mass.1985) ("it makes sense to say that a person sued in his official capacity can be found liable only if the municipality could also be found liable."). That standard, of course, is the *Monell* standard discussed above.

■ The record before this Court is wholly devoid of any evidence which would tend to show that a custom or policy of the Town of Andover is causally related to any injury Mr. Pruneau may have suffered. In his brief, Pruneau argues that a genuine issue of fact to be resolved is whether the Andover Board of Selectmen failed properly to supervise and train the police officers in the town. The Court disagrees. Although the Court views the evidence presented in the light most favorable to Mr. Pruneau, he cannot survive a motion for summary judgment on bare allegations. He has an affirmative duty to adduce some evidence which supports his claim of a factual dispute. *Massaro v. Vernitron Corp.,* 559 F.Supp. 1068, 1073 (D.Mass.1983). Here the only competent evidence[9] Mr. Pruneau presents concerning the alleged deficiencies in training and supervision is a statement in his answers to interrogatories that he received no response from the Selectmen when he complained about the beating. Other than that, Mr. Pruneau appears to rest his claim against the town on the evidence of the beating itself. As such, he has not nearly provided the amount of proof required by *Tuttle.* Assuming *arguendo* that inadequate training can meet the "policy" requirement of *Monell,*[10] such a policy would not itself be unconstitutional. Therefore, *Tuttle* requires "considerably more proof than a sin-

gle incident." 105 S.Ct. at 2436. Accordingly, the motion of the Selectmen will be allowed as to the § 1983 claims.

## V. *State Tort Claims*

In their briefs and at oral argument the parties devoted themselves solely to the federal constitutional issues raised by the motions. The Court rules that as to those parties whose motions are denied as to the § 1983 claims, for virtually the same reasons as are applicable to the federal claims there exist genuine issues of material fact as to the state law claims as well.

■ That leaves only the question of the state law claims against Sergeant Mooers and the Andover Selectmen, whose motions on the federal claims are allowed. As long as the federal claims were present, jurisdiction over these state claims properly existed under the doctrine of pendent claim jurisdiction. Allowing the motions for summary judgment as to these litigants changes all that. It is the settled rule in this Circuit that in a non-diversity case where pendent state claims are joined with the federal cause of action, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed." *United Mine Workers v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139; *Clark v. Taylor,* 710 F.2d 4, 12 (1st Cir.1983); *see also, Strachman v. Palmer,* 177 F.2d 427, 431–434 (1st Cir.1949) (Magruder, J. concurring). Likewise, *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 270 (1976) compels a ruling that this is not an appropriate case for exercising pendent party jurisdiction over these defendants.[11]

---

**9.** Pruneau also claims that he was told by the Federal Bureau of Investigation that the Andover police were under investigation for similar acts of brutality. Such testimony is inadmissible hearsay, Fed.R.Evid. 801 and 802, and not to be considered by a court on a motion for summary judgment. Fed.R.Civ.P. 56(e).

**10.** The Supreme Court expressly reserved opinion on this question in *Tuttle.* 105 S.Ct. at 2436 n. 7.

**11.** *Aldinger* involved a pendent state claim against the county in a § 1983 action against county officials. The case was submitted on the pleadings alone and was decided before *Monell.* Thus, there may now be room for an exception to the *Aldinger* rule in a case where a substantial federal claim is dismissed at or shortly before trial. The *Pruneau* case clearly is not such a case, however, and this Court reserves opinion on this issue for another day.

Therefore, the state law claims against these defendants will be dismissed as beyond the Court's jurisdiction.

## VI.

In accordance with the foregoing discussion it is ORDERED:

1) In the *Bibbo* case, the motion for summary judgment of the Massachusetts Bay Transportation Authority will be allowed as to Counts XXI, XXIII, and XXV (the § 1983 claims), except insofar as those counts allege that the Authority's policy on deadly force violated the Bibbos' constitutional rights. All other motions are denied.

2) In the *Pruneau* case, the motions for summary judgment of the Andover Selectmen and Officer Mooers as to Federal claims are allowed, and the State claims against these defendants are dismissed. All other motions are denied.