**Luis O. Juarbe ANGUEIRA, Plaintiff,**

v.

**Luis Rafael ARIAS, Director of the Public Building Authority, Defendant.**

**Civ. No. 85–995 HL.**

United States District Court, D. Puerto Rico.

Oct. 21, 1986.

Israel Roldán González, Aguadilla, P.R., for plaintiff.

Rafael Vazquez Colón, San Juan, P.R., for Public Bldg. Authority.

Marcos Ramirez Lavandero, José A. Sánchez Alvarez, Ramírez & Ramírez, Hato Rey, P.R., for defendant Luis Rafael Arias.

## OPINION AND ORDER

LAFFITTE, District Judge.

Plaintiff, Luis O. Juarbe Angueira, has brought this action for damages, declaratory relief, and injunctive relief against defendant Luis Rafael Arias, individually and in his official capacity as Director of the Public Building Authority (hereinafter "PBA") pursuant to 42 U.S.C. sect. 1983. Plaintiff alleges a cause of action under the First, Fifth, and Fourteenth Amendments of the U.S. Constitution for his discharge on March 15, 1985 from the position of Regional Director of the Public Building

Authority for the region of Aguadilla. It is plaintiff's contention that his discharge from employment was motivated solely by his political affiliation, and therefore constitutes a violation of his constitutional and statutory rights.

Defendant, in turn, has raised an affirmative defense of qualified immunity, and has filed a Motion for Summary Judgment and concurrent Request for Stay of discovery based upon this asserted defense. After considering defendant's moving papers, plaintiff's response in opposition, and the separately submitted compendium of translated exhibits, this Court finds that both the Motion for Summary Judgment and Request for Stay of proceedings should be DENIED.

## I. FACTUAL BACKGROUND.

Plaintiff alleges that he is a member of the New Progressive Party (hereinafter "NPP"), and that defendant belongs to the Popular Democratic Party (hereinafter "PDP"). The PDP prevailed over the NPP in the general election of November 6, 1984, and was inaugurated into office on January 2, 1985. Defendant Luis Rafael Arias was subsequently appointed Director of the Public Building Authority (hereinafter "PBA"), an agency of the Commonwealth charged with providing and maintaining lodging facilities for the various departments, offices, and municipalities of the government. Approximately three months after defendant's appointment to office, on March 15, 1985, plaintiff was discharged from his post as Regional Director of Aguadilla. The office of Regional Director is classified as a position of "trust and confidence" under the Puerto Rico Public Service Personnel Act, 3 L.P.R.A. section 1349 *et seq.*

Plaintiff had been employed in the capacity of Regional Director of Aguadilla since October 17, 1983. Subsequent to his discharge, the position of Regional Director was occupied by Mr. Javier Soto Cardona, who is a member of and active in the affairs of the PDP. Plaintiff alleges, on information and belief, that the sole reason

for termination of his employment was due to his political affiliation with the NPP.

█ Defendant Luis Rafael Arias now moves for summary judgment. In considering his motion, this Court notes that an award of summary judgment is proper only when it is shown on the pleadings and other evidence in the record that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. To determine whether summary judgment is appropriate, the Court must look at the record "in a light most favorable to ... the party opposing the motion." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). In a patronage dismissal action, summary judgment may properly be granted even in the initial stages of the suit; "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 2808, 86 L.Ed.2d 411 (1985).

## II. THE QUALIFIED IMMUNITY DEFENSE.

Defendant's Motion for Summary Judgment does not refute or deny that plaintiff's discharge was the result of his political ideology.[1] Instead, defendant posits an affirmative defense of qualified immunity, a judicially-created doctrine which provides that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Defendant thus contends that plaintiff's discharge was a discretionary de-

cision, not in contravention of any established law at the time of its execution, and that defendant is therefore entitled to qualified immunity.

## A. THE OBJECTIVE STANDARD

█ A qualified immunity defense requires an objective review that looks to the state of the law at the time of the violation in a two-step analysis. To gauge the validity of such a defense, the Court must ascertain:

1) whether the government official's conduct violated a constitutional right that was "clearly established" at the time; and if so,

2) whether the official reasonably should have known that his acts constituted such a violation.

*Creamer v. Porter*, 754 F.2d 1311, 1317 (8th Cir.1985); *Hobson v. Wilson*, 737 F.2d 1, 26 (D.C.Cir.1984); *De Abadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir.1986).

█ In determining the existing state of the law under step one of the analysis, it is not necessary that a "specific judicial articulation" of a fundamental legal principle be espoused by any court to constitute a well-settled rule. Basic constitutional rights are held to be established law if they are necessary to sustain the scheme of federal jurisprudence embodied in the U.S. Constitution and Bill of Rights. *Blackburn v. Snow*, 771 F.2d 556 (1st Cir.1985); *King v. Higgins*, 702 F.2d 18, 20 (1st Cir.1983).

█ Furthermore, under step two of the Court's review, although a government official will not be bound to "anticipate subsequent legal developments" or " 'know' that the law forbade conduct not previously identified as unlawful," (*Harlow, supra*, 457 U.S. at page 818, 102 S.Ct. at page 2738), he will be held to a uniform level of "presumptive knowledge" of constitutional standards. *Floyd v. Farrell*, 765 F.2d 1, 4–5 (1st Cir.1985). Accordingly, the proper inquiry under the *Harlow* standard requires that the Court "make an

---

1. Defendant does, however, deny this allegation at page one of his answer to plaintiff's complaint, and it is still a disputed issue in this case. Therefore, we will assume a political motivation

for plaintiff's discharge for the purposes of determining this motion alone, not for the merits of the case.

objective analysis of the reasonableness of conduct in light of the facts actually known to the officer and not consider the individual officer's subjective assessment of those facts." *Floyd, supra,* at page 6.

■ Applying this analysis to the facts of the case at bar, we find that at the time of plaintiff's discharge in March of 1986, it was a well-established precept that dismissal of a public employee on the grounds of his or her political orientation was prohibited under the U.S. Constitution. In *Elrod v. Burns,* 427 U.S. 347, 360, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976), the Supreme Court ruled that "the practice of patronage dismissals clearly infringes First Amendment interests," such as freedom of speech and freedom of association, and therefore, is barred as unconstitutional. Similarly, in *Branti v. Finkel,* 445 U.S. 507, 516, 517, 100 S.Ct. 1287, 1293, 1294, 63 L.Ed.2d 574 (1980), the Supreme Court again repudiated patronage dismissals as violative of First Amendment freedoms because of the "coercion of belief that necessarily flows from the knowledge that one must have a sponsor in the dominant party in order to retain one's job." These seminal cases, handed down ten and five years, respectively, before plaintiff's dismissal, conclusively reject termination of a public official's employment for political reasons alone, save in exceptional circumstances.[2]

## B. CONFIDENTIAL EMPLOYEES

Defendant's assertion that plaintiff had no constitutionally protected interest in continued employment because his position

was one of "trust and confidence" under Puerto Rican law[3] is inapposite. The Supreme Court of Puerto Rico,[4] this Court,[5] and the First Circuit Court of Appeals[6] have all held that the Puerto Rico Public Service Personnel Act, 3 L.P.R.A. sections 1349 *et seq.,* which classifies certain government workers as "confidential employees," cannot be held to legislate away an employee's First Amendment protection. Accordingly, defendant's allegation as to the unsettled state of the law at the time of plaintiff's dismissal is without merit.

■ Having failed to establish that plaintiff's dismissal for his political following was an arguably undecided point of law in 1985, defendant's only recourse is to show that plaintiff's position falls within that special class of employment which requires adherence to the same political party as the Director for effective execution. Where political affiliation is a necessary prerequisite to properly complete the functions of a public post, this governmental interest supersedes an employee's First Amendment protections. *Branti,* supra, at 518, 100 S.Ct. at 1294. Accordingly, if defendant can demonstrate that plaintiff's position demanded political adherence by virtue of its inherent duties and responsibilities, defendant will have raised a complete defense, and will be entitled to summary judgment as a matter of law.

## III. THE REQUIREMENT OF PARTY LOYALTY.

■ The standard of review to evaluate the reasonableness of a party loyalty

---

**2.** Although we hold that adjudication of a legal principle by the U.S. Supreme Court is sufficient to constitute "well-settled law," knowledge of which will be imputed to all government officials, we note that the Supreme Court of Puerto Rico had also articulated the same rule three years prior to plaintiff's termination. *Ramos Villanueva v. Secretario De Comercio,* 112 D.P.R. 514 (1982); *Navedo v. Municipio De Ceiba,* 112 D.P.R. 740 (1982). Thus, at the time of plaintiff's termination, the law was clearly established that an individual could not be dismissed on the basis of his political affiliation.

**3.** 3 L.P.R.A. section 1350 states:
"Confidential employees are those who intervene or collaborate substantially in the for-

mulation of public policy, who advise directly. or render direct services to the head of the agency."
Subsection (4) provides that "confidential employees shall be of free selection and removal."

**4.** *Colón v. CRUV,* 84 JTS 52 (P.R.1984); *Ramos Villanueva v. Cintrón,* 82 JTS 556 (P.R.1982); *Clemente González v. Depto. de la Vivienda,* 83 JTS 101 (P.R.1983).

**5.** *Rodríguez v. Muñoz,* 603 F.Supp. 349 (D.C.P.R. 1985).

**6.** *Abadía v. Izquierdo Mora,* 792 F.2d 1187 (1st Cir.1986).

requirement is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. at 518, 100 S.Ct. at 1295. To determine whether political orientation would interfere in the execution of the office, the Court must consider the cumulative functions and duties of the position, as well as its role in the greater structure of the PBA organization itself. Although the extent of the employee's policy-making authority and access to confidential information are significant indicia of a need for political loyalty, *Elrod v. Burns,* 427 U.S. 547, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), they are not dispositive. Factors to be considered include "the scope of discretion and responsibilities of the office," *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974), and employment decisions at the higher level which "are essential to the effective implementation of important government policies." *De Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1191 (1st Cir.1986).

The First Circuit Court of Appeals recently promulgated explicit guidelines with which to evaluate the appropriateness of a political affiliation requirement for a government office in the companion cases of *Jimenez Fuentes v. Torres Gaztambide,* 803 F.2d 1 (1st Cir.1986), and *De Choudens v. Gov't. Development Bank of Puerto Rico,* 801 F.2d 5 (1st Cir.1986). In both cases, a public official was demoted because of his or her political affiliation, and subsequently brought suit against the government, alleging that the demotion was a constitutional violation. The government responded with the affirmative defense that party loyalty was indeed a proper job requirement for plaintiffs' positions.

The District Court granted a preliminary injunction in each case, mandating reinstatement of the employees to their former positions, and the issue was brought before the First Circuit on interlocutory appeal from the grant of injunction. Upon reviewing the District Court's decisions, the Court of Appeals took pains to elaborate a framework of analysis to govern this Court's adjudication of future political discrimination cases. These articulated standards are particularly useful when the public offices in *Jimenez Fuentes* and *De Choudens* are considered together, because the former position was found to require party membership, whereas the latter did not. The two decisions thus stand at opposite ends of the spectrum, and provide a comparative measure by which to gauge similar cases.

We focus more closely upon the case of *Jimenez Fuentes,* because the plaintiffs in that case were Regional Directors of the Puerto Rico Urban Development and Housing Corporation (hereinafter "CRUV") who were demoted to "career positions" as a result of their membership in the NPP. The Court of Appeals reversed the District Court's preliminary injunction ordering reinstatement to the office of Regional Director, on the grounds that plaintiffs failed to show their claims were likely to succeed on the merits. In so concluding, the First Circuit conducted a detailed assessment of the need for partisan political interests, not only in the office of Regional Director, but also in the CRUV agency as a whole, and found that party loyalty was a valid requirement for the position. Based on this premise, the District Court's preliminary injunction was reversed.

To evaluate the need for political affiliation, the Court of Appeals in *Jimenez Fuentes* imposed a threshold inquiry in the review process that looks to the comprehensive objectives and government goals entailed in the office: "does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation? Otherwise stated, do party goals or programs affect the direction, pace or quality of governance?" 803 F.2d at page 6. If this initial inquiry is found in the affirmative, then the court must proceed to a more detailed analysis of the specific duties and responsibilities of the office at issue: "the next step is to examine the particular responsibilities of the position to determine whether it resembles a policymaker, a

privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." 803 F.2d at page 6. If this answer is also in the affirmative, then political patronage is indeed a valid prerequisite for the position, and the defendant is entitled to immunity from suit as well as from damages.

We begin, then, with the preliminary limen articulated by the First Circuit in *Jimenez Fuentes*—a determination of the impact of partisan politics on the exercise of the governmental functions accorded to the Regional Directors of the Public Building Authority. In so doing we are guided by the explicit analysis set forth in that case.

## A. THE EFFECT OF PARTISAN POLITICS ON AGENCY FUNCTIONS

The focal point of the First Circuit's threshold inquiry in *Jimenez Fuentes* was, quite properly, the effect of the political affiliation of the Regional Directors of CRUV on the agency's role of public housing services:

> [T]he provision of housing to low and middle income city residents is a vital political issue, at least as important to partisan program goals as the provision of water discussed in *Tomczak*. [*Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985).] A specific illustration of the link between public housing and political philosophies was provided at the hearing by defendants' expert witness, Dr. Jack Hirsbrunner, who conducted a study of the CRUV and concluded that political affiliation was an appropriate criterion for the position of Regional Director. He testified that the ideological differences between the PNP, which favors statehood for Puerto Rico, and the PPD, which favors autonomy, give rise to conflicting approaches to the programs and functions of CRUV. An ideological conflict, he believed, would hinder an administration's program. For example, one party favors the government taking an active role in administering properties while the other prefers that private industry assume these functions; additionally, he stated that one party desires the utilization of federal funds, while the other supports the use of local funds. 803 F.2d at 7–8.

While interference in government programs for motives of political sabotage may be a concern in public service agencies, which have direct contact with and influence upon the voting electorate, such a risk is not inherent the PBA.

22 L.P.R.A. 901 *et seq.* defines the purpose of the PBA as that of "provid[ing] lodging facilities for the schools, 'Health and Social Welfare Facilities,' offices, quarters, courts, warehouses, shops and other physical facilities of the Commonwealth, any department, agency, instrumentality or municipality." Thus, the PBA's principal function is to establish and maintain the buildings and other facilities that house the governmental and administrative agencies of Puerto Rico. It is not an agency vested with direct and immediate public contact or responsibility for public services, as is the CRUV. Nor is there significant room for ideological conflict in the execution of the duties of the PBA. Instead, the PBA is principally a support agency, whose authority is confined to the limited sphere of government housing and maintenance in a specified region, with little, if any, direct communication with the voting constituents. Although the political debate between autonomy and statehood for Puerto Rico can arguably influence the allocation of public housing provided by the CRUV, as the First Circuit found in *Jimenez Fuentes*, this is not true of the government supplies and services rendered by the PBA. Building repair and maintenance is an apolitical duty that will not be hampered or advanced by the Regional Director's political affiliation. For these reasons, this Court concludes that defendant has failed to satisfy the first test; namely, that the position of Regional Director of the PBA relates to political interests or concerns.

Nonetheless, even if the PBA were deemed a partisan agency, thereby meeting the threshold inquiry, this Court would still

be compelled to deny defendant's Motion for Summary Judgment because the evidence presented does not meet the second standard of the *Jimenez Fuentes-De Choudens* analysis, e.g., a showing that the specific duties and responsibilities of the Regional Director demand political affiliation for proper execution.

## B. THE DUTIES AND RESPONSIBILITIES OF THE REGIONAL DIRECTOR

The second stage of the inquiry looks to "the inherent powers and privileges of the position of Regional Director" *Jimenez Fuentes*, 803 F.2d at page 8, in order to "identify where and how a person in plaintiff's position might help or hinder the pursuit of the [agency] leadership's strategic goals." *De Choudens*, 801 F.2d at page 10. The question is whether, "even assuming that the [agency's] strategic leadership positions are ones for which political affiliation is an appropriate requirement, is plaintiff's position within this group?" *De Choudens*, 801 F.2d at page 8. Assuming *arguendo* that the PBA qualifies under the threshold test as an agency subject to partisan influence, plaintiff's position as Regional Director does not merit political loyalty if it is not one of the strategic policy-making offices of the PBA.

Four specific items of proof were submitted by the parties to this action, itemizing the duties and responsibilities of the PBA Regional Director:

1. Government form OP–16, entitled "Questionnaire of Functions and Duties"; completed by plaintiff himself, and apportioning percentages of his work week to four categories of duties;

2. An organizational diagram of the PBA Administration's "Confidential Employees";

3. Three sworn statements by current PBA employees, one of whom includes the defendant, purporting to list 25 categories of job duties allegedly performed by the Regional Director;[7]

4. The Specification of Class prepared by the PBA, setting forth in general terms the Regional Director's duties, entitled "Itemization of Positions of Trust at the Public Building Authority and Brief Justification for their Classification as Such."

The issue thus becomes whether these documents, when considered separately or as a whole, provide convincing evidence that the Regional Director "perform[s] sufficiently important roles in the government to make political affiliation an appropriate requirement." *Jimenez Fuentes*, 803 F.2d at page 9.

PBA form OP–16 provides a comprehensive listing of the duties and responsibilities of the Regional Director, as prepared by plaintiff himself. According to the job description contained in that document, plaintiff spent approximately 30% of his work time executing the "supervision and coordination of all work to be done in the conservation and maintenance phases of all of the buildings in the Aguadilla region (32 buildings). 25% of his time was employed to "direct and supervise the administrative tasks of the region in its phases of personnel relations, clerical work, requisitions and acquisition of materials, etc.". The remainder of his working hours were employed in drafting the region's annual budget for approval by the Administrative Office, and executing miscellaneous tasks inherent in the office ("carrying out any other related duty that is requested and I am capable of doing").

This Court notes that the duties and functions actually performed by plaintiff are not alone determinative, as the true measure of a government position's need for party loyalty is established by "the inherent powers of the office, not what the individual office-holder actually does … Thus, if an officeholder performs fewer or less important functions than usually at-

---

7. Although these three affidavits ostensibly incorporate what appears to be a governmental OP–16 job description, this Court finds, for reasons discussed *infra,* that they do not qualify as actual OP–16 forms and in fact lack any probative value.

tend his position, he may still be exempt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance." *De Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1192 (1st Cir.1986), quoting *Meeks v. Grimes,* 779 F.2d 417, 419 n. 1 (7th Cir.1985). In other words, the tasks actually executed by a plaintiff cannot be used as a *de facto* limit on the powers of a government office when evaluating the need for party affiliation.

Therefore, we are bound to analyze the position of Regional Director in the very broadest of terms, considering all of the authority and power ascribed to that office by the agency itself. To this end, we will also review the diagram, affidavits and job classification prepared by PBA employees other than plaintiff, which set forth the duties of the Regional Director. The organizational diagram prepared by defendants illustrates the relationships between the upper strata of PBA officials. This pictorial representation shows that the office of Regional Director is actually a sixth level position in the administrative hierarchy, subordinate to the Construction Department, Design Department, Office of Public Relations, Executive Director, and of course, the Board of Directors. The diagram reveals that the office of Regional Director is not an elevated post with significant decision-making authority; rather, it is the very lowest level of the PBA's confidential employees.

Defendant also submitted three affidavits by PBA employees Betsy N. González, Luis Rafael Arias, and Enrique Guzmán Vidal, which purport to describe the duties of the office of Regional Director. Each affidavit consists of a one-page assertion that the responsibilities set forth in the appended OP–16 form are those of the office of Regional Director. Twenty-five categories of duties are then itemized in a separate attachment to the affidavit, and the same attachment, listing identical categories, is used for all three affidavits.

The three affidavits are fatally deficient in that they fail to "show affirmatively that the affiant is competent to testify to the matter stated therein," as required by Rule 56(e) of the Fed.R.Civ.P. There is no showing of the means by which the affiants acquired knowledge of the duties of the PBA Regional Director; no suggestion of the time frame in which such knowledge was acquired; and no indication of the source of the identical appended lists of duties. Instead, the affidavits merely include a blanket assertion that each affiant has "personal knowledge of the functions performed by the Agency's Regional Directors because of my position." This is completely inadequate, for "when affidavits are offered in support of a motion for summary judgment, they must present admissible evidence, and must not only be made on personal knowledge of the affiant, *but must show that the affiant possesses the knowledge asserted."* (Emphasis added.) *Sprague v. Vogt,* 150 F.2d 795, 800 (8th Cir.1945). A verified pleading that fails to affirmatively show the affiant is competent to testify to the matters stated therein, or that the facts asserted are predicated on his personal knowledge, cannot serve as the basis for a motion for summary judgment. *Gordon v. Watson,* 622 F.2d 120, 125 (5th Cir.1980); *Onis v. Barrows,* 538 F.2d 904 (1st Cir.1976). Failure to incorporate such a foundational showing effectively deprives the affidavit of all probative value for purposes of the motion. *Blossom Farm Prods. Co. v. Amtraco Commodity Corp.,* 64 F.R.D. 424 (D.C.N. Y.1974).

We also note that despite the false appearance of authority lent to the three affidavits by their attempted incorporation of the government's OP–16 form, they do not qualify as official, agency-sponsored OP–16 job descriptions. The purported OP–16 appended to each of these affidavits clearly was not prepared in the course of the agency's classification process, and does not include any of the supporting evidence that normally accompanies an agency-sponsored OP–16 job description. The heading, which identifies the individual completing the

form, is left blank, and the form is not signed by its author. Moreover, there is no Spanish version of the listing of duties, as is true of all OP–16 forms executed within the agency. Instead, the document submitted by the affiants is a self-serving job description drafted on an OP–16 form for the sole purpose of providing additional support for defendant's Motion for Summary Judgment.

Accordingly, we do not regard these three documents as agency-executed OP–16 forms, like the one completed by plaintiff, but consider them to be mere statements of opinion in affidavit form. Further, because we find that the affidavits are fatally defective as a matter of law, we decline to accord them any significant probative value.

Defendant's fourth item of proof, the PBA "Itemization of Positions of Trust," which provides the general grant of authority to each administrative office of the agency that qualifies as a position of trust and confidence, merely states that "the Regional Directors have the responsibility for the administration, supervision, direction and inspection of the Authority's projects under construction. Therefore, they coordinate, direct, supervise and inspect the activities comprised in all the construction cycle in his Region." Again, this presents an operational-level position, charged with overseeing execution of quotidian duties, *not* an extensive and unfettered policy-making function.

Plaintiff's responsibilities in the PBA differ from the duties performed by plaintiffs in *Jimenez Fuentes*, in several important respects. In *Jimenez Fuentes*, the Court grouped the duties of the Regional Director into four classes of authoritative power susceptible to political influence: (1) policy-making functions, (2) representative functions, (3) spokesperson functions, and (4) personnel duties. A careful comparison of the job descriptions enumerated under each heading with those assigned to plaintiff

reveals a marked contrast between the position of Regional Director of CRUV, and its counterpart in the PBA.

First, plaintiff was not charged with formulating agency policy or analyzing confidential information; he was merely responsible for overseeing direct execution of the programs and directives established by the Administrative Office of the PBA. His role was analogous to that of a conduit, channeling the agency's prescribed policies into actual projects at the operational level. Although plaintiff had supervisory authority over ministerial tasks, such as the requisition of supplies and prioritizing of work orders, he had little involvement with the total services provided by PBA. Plaintiff had no input into the apportionment of funds to the various regions of the PBA, or the allocation of buildings to different government branches. He did not work in or have an office in the central PBA headquarters, the centralized policy-making body of the agency. Rather, he was one of seven regional directors, whose jurisdiction was strictly circumscribed by their geographic location. Thus, unlike the Regional Directors of CRUV, he was not "the alter ego of the Executive Director at the Regional level," (803 F.2d at page 9), but rather a controlled mechanism by which the Executive Director's preordained mandates were effected. Plaintiff did not make the agency's policy—he was bound by it.

Plaintiff's "representative functions" were also negligible, particularly when compared to the high-profile, community-oriented tasks assigned to the Regional Director of CRUV. Whereas the latter was required to: "[Conduct] periodic meetings on regulations, work guidelines, etc. with supervisory personnel; [Meet] with residents and general public to resolve problem cases; [Meet] with residents and organized groups to coordinate social activities," (803 F.2d at page 8), no such demands were incumbent on plaintiff.[8]

---

**8.** We note that the only "representative function" accorded to the position of PBA Regional Director in defendant's motion was to "repre-

sent the Executive Director at any official meetings with other agency directors, school directors, etc., in order to determine leasing con-

Again, this is attributable in part to the inherent limitations of a government support organization, as distinguished from a public service agency. We also note that plaintiff had none of the "spokesperson functions" mentioned in *Jimenez Fuentes* and *De Choudens*—he did not draft correspondence for the Executive or Associate Directors, and did not interface directly with the Board of Directors on behalf of the agency.

Lastly, plaintiff's "personnel duties" were substantially less discretionary than those of the CRUV positions in *Jimenez Fuentes*. Although plaintiff, like the Regional Directors of CRUV, was vested with power to supervise and evaluate the Region's supervisors and to make recommendations regarding recruitment, dismissals, and promotions, his jurisdiction extended to only 54 employees, as compared to the 300 worker staff in each CRUV region. The majority of those 54 regional workers (approximately 40 people), are union members whose terms of employment are defined by the union contract with the PBA. This obviously leaves the Regional Director with little influence over their salary, working hours, job duties, and cause for termination. Moreover, the Personnel Relations Department of the PBA had the ultimate responsibility for hiring, firing, employee training, negotiating with the labor unions and resolving labor grievances. Thus, the Regional Director's personnel authority is at most the mere ability to suggest or recommend action by the agency's administrators, and then only at the regional level.

■ The fact that a public office is bestowed with a seemingly elevated title does not establish its ranking as a policy-making position, as is shown by the Court's opinion in *De Choudens v. Government Dev't. Bank of Puerto Rico*, 801 F.2d 5 (1st Cir. 1986), the companion case to *Jimenez Fuentes*. In *De Choudens*, the First Circuit held that plaintiff's employment as Senior Vice President of the government bank's Public Financing Department did not necessitate party affiliation for proper execution, because her "policymaking, confidential communicative position" was "both empowered and constrained by the limits of her specialized functions." 801 F.2d at page 9.

In other words, despite her purportedly officious position, the Vice President's discretionary and policy-making authority was sufficiently removed from the politically-influenced functions of the agency so as to abrogate the need for party loyalty.

■ The office of Regional Director of the PBA is similarly constrained to "politically-neutral, technical and professional matters." 801 F.2d at page 9. Like the position of the plaintiff in *De Choudens*, the role of the PBA Regional Director is "so remote from advancing or thwarting the agency's partisan-responsive goals that political affiliation would not be considered an appropriate requirement." 801 F.2d at page 6. The Regional Director's discretionary authority is limited to the requisitioning of supplies, prioritizing of work orders, and making "recommendations" to his supervisor about program flaws and improvement. Clearly, the party membership of the Regional Director would have little, if any, effect on these tasks. Such functions are a far cry from the strategic duties that would permit the representative government to "be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod v. Burns, supra*, 427 U.S. at page 367, 96 S.Ct. at page 2687. Therefore, plaintiff's dismissal based on his party membership does not fall within the political affiliation exception to patronage dismissals.

Defendant has presented no evidence that extraordinary circumstances exist, or that he could not have known his actions were in violation of the U.S. Constitution.

---

tract requirements." Such a task is not a truly representative function, as the Regional Director's contact is limited to other government and agency officials, and is confined to the subject of leasing contracts. Contrast this role with the greater public contact, decision-making authority, and discretionary powers assigned to the Regional Directors of CRUV.

Accordingly, defendant is held to the standard of a reasonably competent official, and is presumed to know the law governing his conduct.

We therefore find that a reasonably competent government official should have known that political affiliation was not an appropriate requirement for the position of PBA Regional Director, and that a discharge for political reasons would violate the First Amendment.

WHEREFORE, defendant's Motion for Summary Judgment is DENIED. There being no reason to impose a stay on discovery or the trial proceedings, the Request for Stay is also DENIED.

IT IS SO ORDERED.