Barry Eric FLOYD, Plaintiff, Appellee,

v.

Richard J. FARRELL, Jr., Individually
and in his Capacity as a Trooper for
the New Hampshire State Police, De-
fendant, Appellant.

No. 84–2031.

United States Court of Appeals,
First Circuit.

June 19, 1985.

Douglas L. Patch, Asst. Atty. Gen., Div. of Legal Counsel, Concord, N.H., with whom Stephen E. Merrill, Atty. Gen., Concord, N.H., was on brief for defendant, appellant.

Edward B. Mulligan, IV, Laconia, N.H., with whom Snierson, McKean & Mattson, P.A., Laconia, N.H., was on brief for plaintiff, appellee.

Before LEVIN H. CAMPBELL, Chief Judge, and BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

This appeal arises out of a 42 U.S.C. § 1983 action brought by Barry Floyd against Richard Farrell, a trooper for the New Hampshire State Police. Floyd alleged that Farrell had intentionally and maliciously arrested him on the felony charge of receiving stolen property in the absence of any probable cause to believe such a felony had been committed and had then caused bail to be set at the sum of $5,000, which resulted in Floyd's incarceration for eleven days. Farrell moved for summary judgment on the ground that, even if the record was viewed in the light most favorable to the plaintiff, the doctrine of qualified immunity provided him with a complete defense to any liability. The district court denied the motion, holding that "[t]he issue of qualified immunity is almost universally one which presents a question of fact to be determined by the trier of fact." Farrell has appealed this ruling and has asked us to find that, as a matter of law, he is immune from any civil liability arising out of his arrest of Floyd and that, consequently, his motion for summary judgment should have been granted.

■ Although we do not ordinarily permit interlocutory appeals of denials of summary judgment, this circuit has recently held that where the issue at summary judgment is either absolute or qualified immunity, we will accept jurisdiction over such appeals. *Krohn v. United States*, 742 F.2d 24 (1st Cir.1984). We found that "the inhospitality ... evidenced [by the Supreme Court's modification of the qualified immunity standard in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)] towards groundless suits against officials, would best be effected by making

denials of the immunity immediately appealable, assuming a plausible claim thereto." *Id.* at 28. The question before us is, therefore, whether under the standard of qualified immunity established by *Harlow,* the facts establishing Farrell's qualified immunity were sufficiently complete and uncontroverted to require that summary judgment be granted.

I

The events leading up to Floyd's arrest began on July 18, 1983, when Farrell stopped a 1975 Chevrolet station wagon with a Massachusetts registration number because its left headlight was not operating. The stop was made around 9:45 P.M. in Moultonboro, New Hampshire. Barry Floyd was the driver of the car and his mother was a passenger in the car. Farrell asked Floyd for his license and registration. Floyd produced an expired Massachusetts driver's license but was unable to produce the registration. His mother looked through the glove compartment and found a copy of a car rental agreement from a Massachusetts rental agency. The rental agreement had expired as of April 15, 1983, and had limited the use of the car to Massachusetts.

Farrell returned to his cruiser and radioed his headquarters to run a National Crime Information Center (NCIC) computer check on both the car and the driver. The NCIC computer showed that the car had been reported as stolen and that an arrest warrant for the theft of the car had been issued for Frank Floyd. The computer also showed that Floyd himself was on parole for various breaking and entering convictions. After assuring himself that Floyd was unarmed, Farrell asked him if he knew the car was stolen. Floyd did not respond to the question. After a short interruption occasioned by the arrival of additional cruisers, Farrell returned to Floyd and asked him whether Frank Floyd was his father. Floyd told him that Frank Floyd was his father. Farrell then asked him again whether the car was stolen. According to Farrell's deposition, Floyd said,

"What do you mean, stolen?" Farrell then told Floyd that the computer indicated that the car was stolen, showed him the expired rental agreement, and told him that his father was wanted for the theft of the car. Floyd's response to this, according to Farrell's deposition, was, "He probably dumped it in New Hampshire. It was getting too hot." At this point, Farrell read Floyd his *Miranda* rights. Sometime during this period, Floyd also said several times, "My father, that son-of-a-bitch, I'll kill him."

After the *Miranda* rights had been read, Farrell began to question Floyd more closely about what he knew about the car. Farrell's deposition shows that Floyd said to him, "Yes the car's probably stolen. He dumped it or ditched it here in New Hampshire." Farrell then asked Floyd where his father was and Floyd told him that he and his mother were just returning from dropping his father at the bus station when they were stopped. When Farrell asked Floyd why his father hadn't taken the car himself, Floyd replied, "It's pretty obvious, don't you think?" or something to that effect. Floyd then told him that his father had left the car for the use of his mother, who lived in New Hampshire.

Farrell then drove Floyd to the Carroll County Jail in Ossipee, New Hampshire, where the bail commissioner set bail at $5,000. According to Farrell's deposition, he played no part in setting this amount; however, when Floyd was arraigned the next morning and the Judge brought up the issue of bail, Farrell recommended that it be kept at $5,000. In his deposition Farrell stated that he made this recommendation since he was concerned that Floyd would be tempted to flee because of his prior criminal record and because he was probably in violation of his parole. During the arraignment, Farrell spoke to Floyd's brother, recommending that he get a New Hampshire lawyer for Floyd and suggesting that he might try to get his father involved because he might be able to testify for Floyd on the issue of whether Floyd knew the car was stolen.

Floyd's brother arranged for a Boston attorney named Levanson to represent Floyd. According to Farrell's deposition, Levanson called him frequently during the next several days and suggested a deal whereby, if the father turned himself into the Massachusetts police, New Hampshire would reduce the charges against Floyd. Farrell's deposition testimony was that he consistently told Levanson that the matter was in the hands of the county attorney and that he could do nothing about it. Levanson then transferred the case to a New Hampshire attorney named Snierson. Snierson contacted Farrell and, according to Farrell's deposition, they discussed the plea bargain proposal suggested by Levanson and Farrell told Snierson that this could only be worked out through the county attorney's office.

A somewhat different story of Farrell's conversations with Levanson and Snierson emerges from Snierson's deposition and affidavit, both of which were submitted with Floyd's opposition to the motion for summary judgment. According to Snierson, Levanson told him that it was Farrell who had proposed the deal reducing the charge against Floyd if his father turned himself in to Massachusetts authorities. Furthermore, Snierson testified in his deposition that when he spoke to Farrell himself that Farrell brought up a deal whereby if the father turned himself in, Farrell would ask to have Floyd's bail reduced to $500 and the felony charge reduced to unlawful use of a motor vehicle, a misdemeanor. Farrell indicated that this would all have to happen fairly quickly, as a grand jury would be available on August 9, and gave Snierson the name of the county attorney. According to Snierson's deposition, he then asked Farrell if "these charges were brought to flush out the father?" and Farrell replied, "You got it."

On July 19, 1983, there was a probable cause hearing on the felony charge and the court found no probable cause for a felony charge. Floyd then pled guilty to the offense of driving without a license and was released. In September of 1983, Floyd filed suit against Farrell alleging violations of his civil rights and malicious prosecution. He asserted that his comments to Farrell at the time of his arrest made it clear that he did not know the car was stolen prior to being informed of that fact by Farrell and that Farrell's conversations with both Levanson and Snierson indicated that Farrell knew there was no probable cause to charge Floyd with receipt of stolen property, but had charged him and arranged for a high bail in an attempt to get Floyd's father to turn himself in.

## II

The general rule of qualified immunity, set out in *Harlow*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 is that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. This standard eliminates from consideration allegations about the official's subjective state of mind, such as bad faith or malicious intention, concentrating the inquiry upon the "objective reasonableness" of the official conduct. *Id.* Under this standard, the reasonableness of the official conduct is not measured against the official's *actual* knowledge of constitutional standards [1] and the probable constitutionality of his or her action, but rather against a relatively uniform level of "presumptive

---

1. An exception is made where the defendant "claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard...." *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738. A concurring opinion by Justices Brennan, Marshall and Blackmun suggests that an official who "*actually knows* that he was violating the law ... [cannot] escape liability for his actions, even if he could not 'reasonably be expected' to know what he actually did know." *Id.* at 821, 102 S.Ct. at 2739 (Brennan, J., concurring). It may be that the Court did not mean to entirely eliminate from consideration actual "subjective" knowledge of constitutional standards, but this is not an issue in the case before us.

knowledge" of constitutional standards. *Id.* at 815, 102 S.Ct. at 2736.

■ We have applied the *Harlow* test to police arrests, *Briggs v. Malley,* 748 F.2d 715 (1st Cir.1984), and have held that seeking an arrest warrant is "objectively reasonable" so long as the presence of probable cause is at least arguable. *Id.* at 719. An officer will be held liable for seeking an arrest warrant later found to be without probable cause only if there *clearly* was no probable cause at the time the warrant was requested. *Id.* We think this rule can be extended to warrantless arrests as well, keeping in mind that probable cause for a warrantless arrest may be different than probable cause for the issuance of an arrest warrant. Despite a finding of no probable cause at a later hearing, a police officer should not be found liable under § 1983 for a warrantless arrest because the presence of probable cause was merely questionable at the time of the arrest. His qualified immunity is pierced only if there clearly was no probable cause at the time the arrest was made.

■ "Probable cause exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a man of reasonable caution and prudence in the belief that the defendant is committing or has committed a crime." *State v. Lemire,* 121 N.H. 1, 424 A.2d 1135, 1138 (1981). An essential element of the felony of receiving stolen property in New Hampshire is knowledge that the property was stolen or the belief that the property probably was stolen. N.H. Rev.Stat.Ann. § 637:7 (1974).[2] If the facts could reasonably have led Farrell to the conclusion that Floyd knew the car was stolen, then he could have reasonably believed that there was possible cause to arrest Floyd. Under the *Harlow* standard, this would be sufficient to allow Farrell to assert the defense of qualified immunity.

With this standard in mind, we now turn to the district court's denial of summary judgment. Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party opposing summary judgment may not create a dispute of facts by bare allegations, but must "point to specific facts that were properly asserted in its affidavits and supporting materials which, if established at trial, would entitle it to prevail on these matters." *Over the Road Drivers, Inc. v. Transport Ins. Co.,* 637 F.2d 816, 818 (1st Cir.1980). In reviewing the district court's decision we must view the record in the light most favorable to the party opposing the motion, *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), and the court must indulge all inferences favorable to that party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 54 (1976). The standard of review is the same regardless of the outcome below. *McSurely v. McClellan,* 697 F.2d 309, 321 (D.C.Cir. 1982).

■ Under the *Harlow* objective test, the question we must ask is whether another officer, standing in Farrell's shoes and having the same information Farrell had, would reasonably have come to the conclusion that he had probable cause to arrest Floyd for receipt of stolen property. The undisputed facts are that Floyd was found in possession of a stolen car, there was a warrant out for the arrest of his father in connection with the theft of the car, Floyd had just dropped his father off at the bus station, Floyd was a convicted felon out on parole, and he was driving with an expired

---

**2.** The statute provides in pertinent part:

    I. A person commits theft if he receives, retains, or disposes of the property of another

knowing that it has been stolen, or believing that it has probably been stolen, with a purpose to deprive the owner thereof.

driver's license. In addition, there does not appear to be any dispute about what Floyd actually said to Farrell. When the statements, "it was getting too hot" and "he probably dumped it" are viewed in light of the other facts available to Farrell, it is clear that Farrell or any other officer in his shoes could reasonably have believed that Floyd knew the car was stolen prior to being questioned about it.

Floyd has argued, however, that we must include in our analysis of Farrell's qualified immunity the statements he made to Floyd's attorneys, especially those purportedly made to Snierson. Snierson claims that Farrell admitted to him that he was only holding Floyd on the felony charge to "flush out" Floyd's father. The contention is that this is relevant to Farrell's qualified immunity because it shows that the "real" reason for the arrest was not a belief that there was probable cause, but malice. In evaluating this contention we start with our finding that, viewed objectively, it would have been reasonable for an officer in these circumstances to believe that there was probable cause to arrest, even though we accept as a given the New Hampshire's court finding of no probable cause. The objective focus of the *Harlow* test precludes us from undercutting this finding of objectively reasonable belief with inquiries into actual motives or beliefs. We note first that Farrell's subjective beliefs about the presence, or lack thereof, of probable cause can be distinguished from the kind of subjective knowledge which we found to be relevant to qualified immunity in *Krohn v. United States*, 742 F.2d 24, 31 (1st Cir.1984). The subjective state of mind at issue here is Farrell's own evaluation of the facts before him, *i.e.*, did he believe that Floyd did not know the car was stolen. The subjective state of mind in *Krohn* was a prosecutor's knowledge of facts about someone else's intentions, something we would not ordinarily expect him to have. The *Harlow* standard requires that we make an objective analysis of the reasonableness of conduct in light of the facts actually known to the officer and not consider the individual officer's subjective assessment of those facts. Nor are actual motives for conduct to be considered in evaluating a qualified immunity defense. It was to prevent such inquiries that the Supreme Court eliminated from the test for qualified immunity consideration of "permissible intentions." *Harlow*, 457 U.S. at 815–19, 102 S.Ct. at 2736–39. But see *Kenyatta v. Moore*, 744 F.2d 1179, 1185 (5th Cir.1984) (subjective motivation must be considered if it forms the basis of the underlying constitutional violation, such as purposeful racial discrimination). Thus, even accepting Snierson's account of his conversation with Farrell, Farrell's alleged statements to Snierson are not relevant to the issue of qualified immunity.

■ We conclude, therefore, that Farrell is immune from any § 1983 liability arising out of the arrest of Floyd. Summary judgment should have been granted. The district court erred when it stated "the issue of qualified immunity is almost universally one which presents a question of fact to be determined by the trier of fact." The adoption of a purely objective test in *Harlow* was meant to facilitate the resolution of questions of qualified immunity by summary judgment. As here, the availability of the defense will often turn upon questions which can be resolved as a matter of law. Factual disputes will result in the denial of summary judgment only when they are relevant to the qualified immunity defense and district courts must carefully review the facts before them in light of the *Harlow* standard before denying summary judgment.

*Reversed.*