Gloria PROKEY, Plaintiff, Appellee,

v.

George WATKINS, et al., Defendants, Appellees.

Scott Cataldi & Roderick Beaulieu, Defendants, Appellants.

Gloria PROKEY, Plaintiff, Appellee,

v.

George WATKINS and James Sweeney, Defendants, Appellants.

Gloria PROKEY, Plaintiff, Appellee,

v.

George WATKINS, et al., Defendants, Appellees.

Mark Clark, Defendant, Appellant.

Gloria PROKEY, Plaintiff, Appellee,

v.

George WATKINS, et al., Defendants, Appellees.

Robert Schwartz, Defendant, Appellant.

Gloria PROKEY, Plaintiff, Appellee,

v.

George WATKINS, et al., Defendants, Appellees.

Thomas S. Roache, Sr., Defendant, Appellant.

Nos. 90–1909 to 90–1913.

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1991.

Decided Aug. 19, 1991.

---

William J. Kayatta, Jr., with whom Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Michael A. Nelson, Jeffrey D. Clements, Jensen Baird Gardner & Henry, Philip M. Coffin, III, Barbara A. Carlin, Richard Mulhern, Black, Lambert, Coffin & Rudman, William L. Vickerson and Levenson, Vickerson & Beneman, Portland, Me., were on briefs for defendants, appellants.

William C. Knowles, with whom Gene Libby, Carl E. Kandutsch and Verrill & Dana, Augusta, Me., were on brief for plaintiff, appellee.

Before CYR and CAMPBELL, Circuit Judges, and ALDRICH, Senior Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

In this interlocutory appeal defendants George Watkins, James Sweeney, Thomas S. Roche, Sr., Robert Schwartz, Mark Clark, Scott Cataldi and Roderick Beaulieu, all police officers, allege that the district court erred in denying them summary judgment on the issue of qualified immunity. Plaintiff Gloria Prokey, a former police officer in Sanford, Maine, brought this civil damages action under 42 U.S.C. §§ 1983 and 1985(3) alleging *inter alia* that members of the Sanford and South Portland Police Departments, as well as the Town of Sanford and the City of South Portland, "in conspiracy, violated plaintiff's rights guaranteed under the Fourth and Fourteenth Amendments to the United States Constitution and under Art. 1, Section 5 of the Maine Constitution to be free from arrest unsupported by probable cause."

## I.

In October 1986,[1] the chiefs of the Sanford and the South Portland Police Departments agreed to exchange officers for the purpose of conducting an undercover drug investigation in each of the municipalities. Gloria Prokey, a police officer in Sanford, volunteered for the assignment and commenced her undercover activities in South Portland on October 15, 1986. She was sworn in as a South Portland police officer and used the name Gloria Martin during her undercover activities. The undercover operation in South Portland was originally intended to continue to the middle of December 1986.

As of early November 1986, Prokey had not been successful in making any drug purchases in her undercover capacity. Sometime before November 14, Prokey had a discussion with Chief Sweeney of the Sanford Police Department in which he mentioned the fact that Prokey had been unsuccessful in purchasing any drugs and indicated the possibility that some change might be made in her assignment. On the evening of November 14, 1986, Prokey reported to her South Portland backup officers[2] that she had purchased cocaine from one Mark Heald. Prokey delivered the allegedly purchased material to them, which was later tested and found to contain cocaine. She made no other purchases of drugs in her undercover capacity, and on December 1, 1986, was removed from the assignment in South Portland. Shortly thereafter, another Sanford Police officer (defendant Scott Cataldi) was assigned to the South Portland undercover assignment.

Early in the course of her undercover activities, Prokey had reported that one Steven Bumpus was a possible source for the purchase of drugs. At a later date during the undercover operation she developed an intimate sexual relationship with Mr. Bumpus. This relationship continued after the date on which Prokey was removed from the undercover operation and returned to normal patrol duties in Sanford.

Early in January 1987, Lieutenant Thomas Roche of the South Portland Police Department received information from his niece that she had heard Steven Bumpus refer to an individual as being the "narc Gloria warned me about." The statement allegedly made by Mr. Bumpus was made at a time shortly after he got out of Officer Cataldi's automobile after Officer Cataldi had given him a ride home. Lieutenant Roche's niece stated that Mr. Bumpus came over to the automobile in which she was seated and pointed to someone in an automobile behind her automobile. He then allegedly made the statement concerning the person being the "narc Gloria warned me about." Lieutenant Roche became concerned and on January 4, 1987 he notified Officer Cataldi that his "cover may have been blown."

On January 7, 1987, a meeting was held at the South Portland police station which was attended by Assistant District Attorney Neale Duffett, Lieutenant Dale Austin of the South Portland Police and by Officers Schwartz, Roche, Sweeney, Watkins, Beaulieu and Cataldi. The purpose of the meeting was to bring together information concerning possible internal and criminal charges that could be brought against the plaintiff and to formulate a game plan with respect to the situation involving the plaintiff.

The South Portland Police Department undertook a criminal investigation and the Sanford Police Department initiated an internal investigation of the plaintiff's activities while she was working in the South Portland undercover operation. As part of the internal investigation, Lori Ducharme, Prokey's partner, was asked to prepare a report of her observations on the evening

---

1. Much of our summary is based on Magistrate Judge Keith's July 25, 1990, Recommended Disposition of Defendants' Motions for Summary Judgment. This, in turn, was based on extensive depositions, exhibits, and other types of evidentiary materials which we have reviewed carefully.

2. Officers Brian Beckwith and Martin Murphy of the South Portland Police Department had been assigned to provide backup coverage for the plaintiff while she was engaged in her undercover activities in South Portland.

of Prokey's alleged drug buy. Although tending to substantiate Prokey's account, this report was not widely circulated prior to Prokey's arrest.

On January 19, 1987, Assistant District Attorney Duffett was working with various police officials in the preparation of warrants and complaints arising out of the undercover drug investigations which had been conducted in South Portland. The meeting of January 19, 1987 at the South Portland police station was attended by Assistant District Attorney Duffett, Sanford Police Officer Steve Caron and defendants Cataldi, Beaulieu, Roche and Clark. Prokey's report concerning the alleged purchase of cocaine from Mark Heald was reviewed by Mr. Duffett. He concluded that he would not charge Mr. Heald because he was concerned that he would not be able to use Prokey as a witness because of information concerning her relationship with Mr. Bumpus, which had been supplied to him by the police officers. Mr. Duffett had such doubts about the truthfulness of the report filed by Prokey that discussions ensued concerning the filing of charges against her for filing a false report. A statement was obtained from Mark Heald in which he denied selling cocaine to Prokey. At the request of Mr. Duffett, Mr. Heald took a polygraph examination. Defendant Mark Clark administered the polygraph examination and reported that Mr. Heald was substantially truthful in his denial of a sale of cocaine to Prokey. It is alleged that subsequently Mr. Clark admitted that his report on the polygraph result was false.

On January 20, 1987, District Attorney Paul Aranson authorized the filing of a complaint charging plaintiff with filing a false public report in violation of Title 17–A M.R.S.A. § 509. The criminal complaint alleged that plaintiff "did knowingly give or cause to be given false information to a law enforcement officer, namely, that one Mark Heald, sold cocaine to Gloria Prokey on November 14, 1986 in the City of South Portland, said information being given to Brian Beckwith, a police officer with the City of South Portland, with the intent to induce the said Brian Beckwith to believe that the said Mark Heald committed the crime of Unlawful Trafficking in a Schedule B Drug in violation of Title 17A [17–A] M.R.S.A. § 1103, knowing the information to be false." A warrant for Prokey's arrest was issued. The filing of the charges against her was authorized by District Attorney Aranson as a result of the information presented to him by Detective Roche of the South Portland Police Department. Aranson was not informed that Assistant District Attorney Duffett had been involved in the case since the beginning of January.

On the same day the warrant was issued, Prokey appeared at the Sanford police station with her attorney for the purpose of an interview with respect to the Sanford internal investigation. They were informed of the issuance of the warrant and they then went to the South Portland police station where the plaintiff was booked and released on personal recognizance.

Prokey had been suspended with pay by the Sanford police chief on January 8, 1987. On January 28, 1987, the officers in charge of the Sanford internal investigation conducted a taped interview with Prokey. She was suspended without pay by Chief Sweeney on February 4, 1987. At that time, she was given a copy of a complaint, containing 22 charges, which had been filed against her by the officers who conducted the internal investigation.

Hearings were subsequently held by the Sanford police chief and at their conclusion he dismissed all but one of the charges. Prokey was suspended without pay for 60 days. The execution of all but 45 days of the suspension was suspended and she was placed on probation for one year. Prokey appealed to the town manager, who held a hearing and affirmed the action of Chief Sweeney. Plaintiff then appealed to the Board of Selectmen. Following a hearing, the Board reversed the action of the Chief Sweeney and the town manager, ordered Prokey reinstated with back pay and directed that all records pertaining to the disciplinary action be removed from her personnel file. Prokey then brought this civil rights action against the City of South Portland,

the Town of Sanford and named officers of the South Portland and Sanford Police Departments.

In Count I, the only claim at issue in this appeal, Prokey alleged that defendants conspired to arrest her without probable cause in violation of her civil rights. 42 U.S.C. § 1983, § 1985(3). Prokey relied on an affidavit of Dale Austin to support her claim of conspiracy. The Austin affidavit details the meeting of January 7, 1987 at the South Portland police station. It states that the Sanford officers wanted to use an arrest warrant as a means to obtain a confession from the plaintiff which would result in her dismissal from the Sanford Police Department and that the Sanford officers viewed an arrest warrant as a psychological ploy to obtain plaintiff's confession. The Austin affidavit further avers that (i) the Sanford officers' idea was to bring Prokey "into the station with the warrant and throw it down on the table in front of her in an effort to leverage a confession," (ii) "the Sanford officers wanted to get an officer they believed had gone bad" and "[t]hey were so intent in removing their bad apple that they insisted on acting with marginal information." Austin further declares that Assistant District Attorney Duffett was asked to authorize a criminal complaint, that his response was that he would "reluctantly" issue a warrant, but that he would dismiss the charges if they ever came to trial because the evidence was insufficient to support the charges.

■ The statements contained in the Austin affidavit are substantiated by the testimony of Lieutenant Roche during his deposition taken on October 31, 1989. Lieutenant Roche testified that at the January 7, 1987 meeting (i) Duffett said he would issue a complaint but that if there was no further information he would have to dismiss the charges; (ii) there was a discussion of a plan to get a complaint and warrant to try to force Prokey to resign

and that the warrant was to be issued to assist Sanford, the intent being to obtain Prokey's resignation. Lieutenant Roche further testified that there was no further investigation planned at the January 7, 1987 meeting.[3]

The defendants moved for summary judgment on qualified immunity grounds on Count I (violation of Prokey's right to be free from arrest unsupported by probable cause), Count II (deprivation of procedural due process rights), Count III (deprivation of substantive due process rights), and Counts IV and V (recovery on the ground of sexual discrimination). In a lengthy memorandum, the magistrate recommended that Counts IV and V be dismissed against all the defendants, and that Counts II and III be dismissed against the defendants now on appeal. The magistrate, however, did not recommend dismissal of Count I against appellants. Instead he ruled that there were genuine issues of fact which were material to the resolution of the conspiracy and probable cause and qualified immunity issues. The district court, in an order dated August 28, 1990, adopted in full the recommended disposition of the magistrate.

## II.

Defendants assert that they were entitled to summary judgment on Count I on the basis of their qualified immunity. They contend that, at very least, the record shows that a reasonably competent police officer could have believed there was probable cause to arrest Prokey at the time they sought the warrant. We reject this contention, as we think that disputed facts and inferences must be resolved by a fact finder in order to determine whether or not, as defendants contend, a reasonably competent officer could have found probable cause in these circumstances.

The general rule of qualified immunity, set out in *Harlow v. Fitzgerald*, 457 U.S. 800, 812, 102 S.Ct. 2727, 2735, 73 L.Ed.2d

---

**3.** We note that the Austin affidavit, while perhaps supporting Prokey's allegation of conspiracy, does not necessarily establish the officers' knowledge of a lack of probable cause to arrest Prokey. A district attorney may properly feel that he has probable cause to arrest, but will eventually need more evidence for a trial.

396 (1982), is that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Ayala Serrano v. Lebrón Gonzalez,* 909 F.2d 8, 13 (1st Cir.1990); *Brennan v. Hendrigan,* 888 F.2d 189, 192 (1st Cir.1989); *Floyd v. Farrell,* 765 F.2d 1 (1st Cir.1985). The Supreme Court has stated that "[u]nder the *Harlow* standard ... an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Seeking an arrest warrant is "objectively reasonable" so long as the presence of probable cause is at least arguable. *Floyd,* 765 F.2d at 5.[4] Police officers "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue immunity should be recognized." *Malley,* 475 U.S. at 341, 106 S.Ct. at 1096. Thus, in cases where law enforcement officials reasonably but mistakenly conclude that probable cause is present, those "officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987).[5] From this standard, "[i]t follows ... that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials." *Anderson* 483 U.S. at 641, 107 S.Ct. at 3040.

Summary judgment is only appropriate when the pleadings and other submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.Civ.P. 56(c). "To demonstrate that no genuine issue of material fact exists, the moving party must point out 'an absence of evidence supporting the non-moving party's case.'" *Daury v. Smith,* 842 F.2d 9, 11 (1st Cir.1988) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The question before us, therefore, is whether a material issue of fact exists as to whether an officer of reasonable competence might have found probable cause on the basis of the information known to the defendants at the time.

■ In stating the above, familiar standard, we proceed on the assumption that *Harlow,* 457 U.S. 800, 102 S.Ct. 2727 and *Creighton,* 483 U.S. 635, 107 S.Ct. 3034, anticipate that qualified immunity issues when raised on summary judgment will be analyzed under usual Fed.R.Civ.P. 56 procedures. *Harlow* and *Creighton* do not specifically say what happens if a genuine factual dispute concerning the information known to the officer surfaces and persists during summary judgment proceedings over qualified immunity. But we doubt the Supreme Court intended this dispute to be resolved from the bench by fiat.[6] *Unwin*

---

**4.** To be "arguable" under *Floyd* means that it is possible for "officers of reasonable competence" to fairly disagree over whether probable cause exists. *See Malley,* 475 U.S. at 341, 106 S.Ct. at 1096. The presence of probable cause would not be "arguable" if no reasonably competent officer would have found probable cause. *Id.*

**5.** Under Maine law probable cause exists whenever "facts and circumstances within the knowledge of the police and of which there was reasonably trustworthy information would warrant a prudent and cautious person to believe the arrestee had committed the crime." *State v. Candage,* 549 A.2d 355, 360 (Me.1988) (citing *State v. Anderson,* 447 A.2d 827, 829 (Me.1982).

**6.** *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), supports this view. *Mitchell* dealt with the appealability of a denial of qualified immunity. Explaining the *Harlow* standard, the Court said that,

[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. Even if the plaintiff's complaint adequately alleged the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient

*v. Campbell,* 863 F.2d 124 (1st Cir.1988). *Turner v. Dammon,* 848 F.2d 440 (4th Cir.1988). *Green v. Carlson,* 826 F.2d 647, 652 (7th Cir.1987).

■ To be sure, qualified immunity claims may often be resolved in a defendant's favor as a matter of law, after the court first assumes all facts in plaintiff's favor, as conventional summary judgment practice requires. But in those perhaps rare cases when this is impossible—when only a fact finder's determination of the conflicting evidence as to the underlying historical facts will permit resolution of the immunity issue—summary judgment ceases to be an appropriate vehicle. Whether, here, a reasonable policeman, on the basis of the information known to him, could have believed there was probable cause is a question of law, subject to resolution by the judge not the jury. *See Hall v. Ochs,* 817 F.2d 920, 924 (1st Cir.1987). Nevertheless, if what the policeman knew prior to the arrest is genuinely in dispute, and if a reasonable officer's perception of probable cause would differ depending on the correct version, that factual dispute must be resolved by a fact finder. *See Vacca v. Barletta,* 933 F.2d 31, 34–35 (1st Cir.1991); *Rakovich v. Wade,* 850 F.2d 1180, 1202 (7th Cir.), *cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

Here, like the magistrate and the district court, we do not find the facts relative to probable cause to arrest, and the alleged related conspiracy, so plain as to lead us to only a single conclusion, i.e., a conclusion in defendants' favor. The facts are complex, intricate and in key areas contested. Even more important, the inferences to be drawn from the web of facts are disputed and unclear—and are likely to depend on credibility judgments. This is not to suggest that there is some need to probe the subjective good faith of the defendants. Rather the issue is solely "whether a reasonable officer could have believed [defendants' securing of an arrest warrant on the false

public report charge] to be lawful, in light of clearly established law, and the information the ... officers possessed." *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040. The information possessed by the officers included information from and about various key actors, including Prokey herself, her lover, Bumpus, and the person she allegedly purchased drugs from, Heald. Also to be evaluated were the results of the lie detector test, the conflicting reports of its operation, and a host of facts either strengthening or weakening the significance of the primary factors as they bore on the existence of probable cause. We see no way for an appellate court to puzzle through this maze purely "as a matter of law," nor can we say, if all the evidence is presumed in plaintiff's favor, that a finding of defendants' immunity is nonetheless appropriate, on the theory that officers of reasonable competence could have found probable cause based on a belief that Prokey had lied when she reported a drug sale to Mark Heald. *Compare Floyd v. Farrell,* 765 F.2d 1 (1st Cir.1985) (qualified immunity found as a matter of law).

■■ Certain of the defendants, for example, Cataldi and Beaulieu, contend forcefully that, because they lacked certain information such as the Ducharme interview, they could not have recognized the possible strengths of Prokey's position. Chief Schwartz, Detective Clark, and others argue that they were too remote from the actual decision to arrest on the false report charges. We have considered these factors, but conclude that there remain issues of disputed material fact and inferences. For example, if Prokey proves that the officers conspired to arrest her without probable cause, the co-conspirators could be held responsible for the allegedly illegal arrest, notwithstanding their limited knowledge of exculpatory factors or of the actual details forming the basis of the warrant. In so saying, we do not, of course, intimate

to create a genuine issue as to whether the defendant in fact committed those acts.
We read the last sentence to imply that if discovery does uncover evidence sufficient to create a genuine issue of fact, the defendant is not

entitled to resolution of his qualified immunity claim by summary judgment. *See also Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (affirming this court's remand for trial).

that the defendants did in fact conspire or that they should be held liable; we state this merely as one possible outcome, after viewing the record most favorably to plaintiff as, on summary judgment, we are obliged to do. Thus, we conclude that a genuine issue of fact exists as to the extent and nature of each officer's knowledge of the information in support of the arrest warrant and of his participation in the alleged conspiracy. *See Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039. It follows that summary judgment on qualified immunity is not appropriate at this time.

We add that, of course, there can be no dispute that the officers were chargeable with knowledge that probable cause was required for issuance of an arrest warrant. The law as to this was unmistakably clear. As the magistrate observed:

> It takes no extensive citation of authority to support a finding that at the time of the plaintiff's arrest it was clearly established that the arrest of a person without probable cause violates the person's constitutional rights. The Fourth Amendment provides: "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause...." The Fourth Amendment is applicable to the states. *Mapp v. Ohio,* 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961). That an arrest without probable cause is unlawful must be a fundamental precept imparted to all police officers. The defendants clearly should have known that an arrest without probable cause amounts to a constitutional violation.

Nevertheless, while the legal standard is clear, application of that standard for purposes of the qualified immunity determination depends upon answers to fact-specific questions concerning the officers' knowledge at the time of arrest—questions which, in this case, cannot be resolved on summary judgment.[7]

By permitting interlocutory appeal from a denial of summary judgment based on an assertion of qualified immunity, the Supreme Court recognized that the immunity is not simply immunity from liability, but also immunity from suit in groundless cases. *See Mitchell v. Forsyth,* 472 U.S. at 526, 105 S.Ct. at 2815. Nevertheless, by providing for interlocutory review, *Mitchell* and its progeny did not alter the traditional roles of the judge and jury in cases involving qualified immunity. In *Mitchell,* the Court emphasized that the "the appealable issue is a purely legal one: whether the facts alleged (by the plaintiff, or in some cases, the defendant) support a claim of violation of clearly established law." 472 U.S. at 528 n. 9, 105 S.Ct. at 2816 n. 9. Once a party has obtained at the interlocutory stage the fullest review feasible of qualified immunity viewed as a "purely legal" question, the action should proceed to trial, following a normal course.

*Affirmed. Costs to appellee.*

---

7. Our holding that factual issues remain does not, of course, limit the district court's normal authority, as the action continues, to further consider the legal status of the claim against any defendant, or to dispose of any claim by directed verdict, in light of further development of the facts.