Roy RAMOS, Plaintiff,

v.

SEDGWICK COUNTY SHERIFF'S DEPARTMENT and Det. Gregg W. Etter, Defendants.

No. 87–956–CIV.

United States District Court, S.D. Florida.

Oct. 29, 1991.

**1458**

Jesus F. Bujan, Miami, Fla., for plaintiff.

Miles A. McGrane, III, Kubicki, Bradley, et al., Miami, Fla., for defendants.

## ORDER

MARCUS, District Judge.

THIS CAUSE is before the Court on Plaintiff's post-trial Motion for Judgment Not Withstanding the Verdict or in the Alternative for a New Trial, and Defendants' Motion for Judgment Notwithstanding the Verdict and Renewed Motion for Directed Verdict. Three questions are raised by these post-trial motions: (1) whether as a matter of law Defendants are entitled to qualified immunity; (2) whether as a matter of law there existed probable cause to arrest Plaintiff; and (3) whether Plaintiff stipulated and agreed during trial that a finding of qualified immunity was a bar to his pendent state-law claims. For the reasons which follow, we answer these questions in the affirmative. Accordingly, Plaintiff's motion is DENIED, and Defendants' motion is GRANTED.

Plaintiff Roy Ramos ("Ramos") brought suit against Defendants Sedgwick County Sheriff's Department (the "Department") and Detective Gregg W. Etter ("Etter"), alleging the violation of his civil rights under 42 U.S.C. § 1983 (Count VIII), arising out of Plaintiff's arrest in connection with the rape and assault of Donna Flowers in the state of Kansas. Specifically, Plaintiff alleged that he was arrested by Defendant Det. Etter without probable cause, albeit pursuant to a warrant issued by a neutral magistrate, and in the course of this illegal arrest was assaulted, slan-

dered, and falsely imprisoned. Plaintiff also filed a number of pendent state-law claims (Counts I, II, III, IV) arising out of the same set of facts, namely false imprisonment, assault, battery, and malicious prosecution. The Defendants claimed that there was probable cause to arrest Plaintiff, and in any event, that they were entitled to qualified immunity since there was "arguable probable cause." All issues were submitted to the jury, with instructions that, among other things, if either probable cause was found, or if the Defendants were entitled to qualified immunity, the inquiry was ended, the jury need not address the pendent state claims, and the jury was to sign the Verdict Form and return to the courtroom.[1] Upon deliberation, the jury concluded that no probable cause was present, but that the Defendants were nonetheless entitled to qualified immunity. Plaintiff now moves the court for Judgment Notwithstanding the Verdict ("JNOV") as to Count VIII on the issue of Defendants' entitlement to qualified immunity,[2] and for a New Trial as to Counts I–IV on the grounds that qualified immunity is not properly a defense to the pendent state law claims. Defendants, in turn, also move the Court for JNOV on the issue of probable cause. Defendants also argue that, during the trial, Plaintiff agreed that in this case a finding of qualified immunity would operate as a bar to the pendent state law claims.

The Eleventh Circuit has set forth the applicable standard for review on the motion for JNOV:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court be-

---

1. The Verdict Form is annexed hereto as an appendix.

2. Specifically, Plaintiff claims that the facts here cannot, as a matter of law, support a finding of

qualified immunity as to Etter, and that in any event, as a matter of law the Department cannot avail itself of the qualified immunity defense.

lieves that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.

*Von Stein v. Brescher,* 904 F.2d 572, 578 (11th Cir.1990) (quoting *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969)) (en banc). And regarding the motion for a new trial,

A district court can grant a motion for a new trial if the jury's verdict is contrary to the great weight of the evidence. Unlike the standard employed in deciding a motion for judgment n.o.v., the court can reweigh the evidence in deciding whether to grant a new trial.

*Von Stein v. Brescher,* 696 F.Supp. 606, 615 (S.D.Fla.1988) (quoting *Popham v. City of Kennesaw,* 820 F.2d 1570, 1577 (11th Cir.1987)), *rev'd on other grounds,* 904 F.2d 572 (11th Cir.1990). Against this framework, we proceed to evaluate the parties' respective motions.

■■■ At the outset it is necessary to define the concepts of probable cause and qualified immunity. As to the former,

a law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a

prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.... The existence of probable cause to arrest is based on objective standards.

*Von Stein,* 904 F.2d at 578 (citations omitted). The standard of probable cause is to be measured against a reasonable common-sense understanding of the term. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). The qualified immunity standard is likewise an objective one, and "does not include an inquiry into the officers' subjective intent or beliefs." *Von Stein,* 904 F.2d at 579 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Further,

[i]n determining whether qualified immunity exists, the issue is "not probable cause in fact but 'arguable' probable cause." *Gorra v. Hanson,* 880 F.2d 95, 97 (8th Cir.1989) (quoting *Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir.1985)). Actual probable cause is not necessary for an arrest to be objectively reasonable. Indeed, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... in such cases those officials ... should not be held personally liable." [*Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987) ].

904 F.2d at 579. Here, for the reasons which follow, we conclude that the facts clearly warrant a finding of "arguable probable cause," and therefore of qualified immunity. In fact, we believe that the facts strongly support a finding of actual probable cause as a matter of law. Accordingly, we find that Defendant Det. Etter had probable cause to arrest Plaintiff, and is therefore not liable on either the section 1983 or pendent state law claims.[3]

---

3. As to the liability of the Department, we note that the municipal liability asserted here is strictly derivative liability, since the Plaintiff has not alleged any specific Departmental action (e.g. official policymaking, failure to train) which would support a finding of municipal

liability; absent such a showing, a municipality will generally not be held to respond for the actions of an individual actor. *See Manor Healthcare Corp. v. Lomelo,* 929 F.2d 633, 637 (11th Cir.1991) ("[M]unicipalities cannot be held liable on a theory of *respondeat superior.*" (cit-

The threshold issue is whether a reasonable police officer in the same circumstances and possessing the same knowledge as Det. Etter would have believed that Plaintiff had committed a crime, or that probable cause existed to arrest Plaintiff. The answer derived from the full trial record must strongly be yes. Beyond that, we hold that the facts clearly warrant a finding of arguable probable cause, and therefore a finding of qualified immunity. We begin by noting that if the magistrate who issued the arrest warrant for Plaintiff Ramos had before him all of the information with all of the qualifications and provisos suggested by the Plaintiff, there still would clearly be probable cause, and surely there would be arguable probable cause. In the first place, the affidavit submitted by Defendant Det. Etter in support of the arrest of Plaintiff accurately stated that Donna Flowers, the victim of a brutal rape and assault, prepared an identikit or composite of a "second Cuban" involved in the assault soon after the incident, that this identikit was given to Metro Dade Officers Carter, Hernandez, and Delgado, and finally that all three officers categorically stated that the Plaintiff Roy Ramos looked like the composite or identikit prepared by the victim. The Plaintiff has presented nothing whatsoever to undermine that statement in the affidavit. Standing alone, that proof makes a finding of probable cause more likely than not. Second, the facts adduced at trial established that Carter in fact told Defendant Etter that Roy Ramos was present when his brother, Raul Ramos, was arrested for the same offense, at which time, according to Carter, Roy Ramos had blond hair and was clean shaven. Carter added, however, that the next time he saw Roy Ramos, Ramos had changed his hair color and had grown a moustache.[4] Third, if the affidavit had included Donna Flowers's physical description of the Plaintiff—including that the second Cuban was 24–30, had a baby face, was a Hispanic male, weighed between 165–170 lbs., was stocky, was clean shaven, and had green eyes—the description would not have vitiated a finding of probable cause. The Plaintiff in fact is stocky, was 19 years old at the time of the incident, has a baby face, and has blue eyes. And while it is true that he does not speak with an accent, and that Flowers's

ing *Monell v. City of New York Dep't of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978))).

In any event, in the instant matter the Plaintiff stipulated that the liability of both Etter and the Department was necessarily intertwined, and that the Department could not be liable absent a finding of individual liability on the part of Etter. In a discussion regarding the Verdict Form, after both sides had rested, the following colloquy occurred:

Pl: "As the issues are framed they are against Etter and the Sedgwick County Sheriff's Department."

. . . . .

Def: "But if they answer yes to Etter they cannot answer no as to Sedgwick County. You can't get inconsistent rulings from the jury, judge, if someone's vicariously liable. . . ."

Jdg: "If they find that Etter falsely imprisoned Ramos, then they necessarily will have found that the Sheriff's Department falsely imprisoned him."

. . . . .

P: "I think there should be a breakdown as to both. . . ."

. . . . .

J: "I don't understand how you could separate it out . . . Maybe I've misapprehended the law. . . . There is no way they can find Etter liable and Sedgwick County not; there's no way they can find, conversely, Sedgwick County liable and Etter not, right? . . . Am I right about that—they can't find one and not the other."

P: "You're absolutely right, your honor."

J: "These two defendants are inextricably bound together."

P: "Yes sir."

J: "It's an all or nothing proposition as to the counts that they're both charged in."

P: "Yes."

J: "So if I say 'Do you find that Greg Etter and the Sedgwick County Sheriff's Department falsely imprisoned the plaintiff Roy Ramos,' does that do it?"

P: "Yes."

Transcription of Audio Tape, October 4, 1990.

4. While there was a dispute at trial as to whether or not Plaintiff dyed his hair and had a moustache, there is no real question as to what Carter told Etter in this regard.

description of his weight was off by as much as 30–40 lbs., we believe that this does not alter a finding of probable cause. Fourth, Flowers's account of the entire incident was corroborated independently in a number of material ways including the following:

1. Her description of the farmhouse where she was taken and at which she was assaulted and repeatedly raped was corroborated by viewing and ultimately searching the farmhouse;

2. Her description of the car in which she was kidnapped was corroborated; indeed, the police found a maroon car matching the description she gave at the farmhouse;

3. The Wichita Police Department independently was informed by disinterested bystanders that a kidnapping occurred at a time and under circumstances wholly consistent with Flowers's account;

4. Flowers was visibly bruised and beaten when she was observed at the hospital by Det. Etter, and she had rope burns, black eyes, and broken bones; in the farmhouse the agents found rope consistent with her account of being bound by her feet and consistent with the rope burns on her body;

5. Also recovered by the investigative officers were weapons consistent with her account;

6. She positively identified Raul Ramos as one of the assailants, and Raul Ramos, the Plaintiff's brother, was arrested at a time when the Plaintiff was present at Raul's house in Dade County; and

7. The search of Paul Gestl's home revealed dead animals as described by the victim.[5]

Additionally, by Flowers's own statement given by deposition some years after the incident, she admitted and the testimony established that she picked out of a good photo spread of six people the photograph of Plaintiff Roy Ramos as an assailant and signed the back of the picture. Her recollection, as embodied in her deposition, that she had expressed some doubts about the identification, if included in the affidavit, would not have vitiated the probable cause to arrest the Plaintiff, and surely would not have altered a finding of arguable probable cause. Flowers did, by her own statement, "pick out the picture," albeit with "some doubt in her mind." Her request to see the Plaintiff face-to-face with a hat on does not undermine the identification. When coupled with Carter, Hernandez, and Delgado's positive identification of Plaintiff Roy Ramos from the composite identikit created by the rape victim Flowers, the fact that Flowers picked Plaintiff's picture out of a good photo spread and signed it, we believe, is sufficient to clearly warrant a finding of probable cause. As Flowers stated in response to a question at her deposition:

Q. But did you pull one out?

A. Yes. I pulled one out and I said I think this is, this might be him, I'm not sure, is exactly what I did, yes.[6]

At most, from Plaintiff's perspective, the Flowers identification of Ramos amounted to a probable one. We add that the name Raul Ramos, the Plaintiff's brother, was found at the Wichita Inn at the time frame relevant to the case, and that Raul Ramos's signature appeared on the registration card at the hotel.

In the same time frame, Carter stated in a letter he sent to Det. Etter that the Metro Dade Police Department had checked to see if Plaintiff had an alibi. These additional investigative steps were taken at the specific direction of the Defendant Det. Etter. Specifically, Metro Dade police officers checked with Plaintiff's job as a security guard at a local school. Carter's letter did state that Plaintiff was off May 8th at 4:30 PM, off the 9th and 10th, and returned to work on the 11th. Carter added, however, that "this wasn't definite,"

---

5. We add that Det. Etter took a variety of investigative steps to corroborate the account given by Flowers.

6. While the better practice may be to conduct a face-to-face lineup, we are not prepared to say that the failure to do so, on these facts, where Flowers was in Kansas and the Plaintiff in Miami until arrest and extradition, somehow robbed the affidavit of probable cause.

referring perhaps to the fact that Plaintiff returned to work on the 11th. At all events, even if the entire letter was appended to the affidavit in support of the arrest warrant, it could not have undermined a finding of probable cause. At most, from Plaintiff's perspective, it might have created a possible ambiguity as to Carter's meaning, and might have left open and unanswered the question whether Plaintiff was at work on May 9th or 10th. In no sense can the letter be characterized as an alibi. And in no sense can the letter undermine a finding of probable cause based on the unambiguous identification of Ramos by three Metro Dade police officers from a detailed identikit or composite prepared by Flowers, the victim, and based on the fact that the victim selected the photograph of the Plaintiff Roy Ramos from a good photo spread of six people and signed the back of the picture.

Finally, Plaintiff has pointed at the failure of Paul Gestl to positively identify the Plaintiff from a photo spread of pictures. Given the fact that probable cause is plainly established from all the facts as enumerated, the inclusion of Gestl's inability to identify the Plaintiff would not vitiate a finding of probable cause. We also note in passing that Gestl's account in fact corroborates the account given by Flowers as to the underlying assault and battery.

A careful review of this record establishes that the investigative steps taken by Defendant Det. Etter were reasonable, thoughtful, and consistent with the prudent conduct of a reasonable police officer. A variety of independent corroborative steps was taken, search warrants were obtained, Flowers's account was substantially corroborated, composite pictures were created, careful photo lineups were presented to material witnesses, and a verification of Plaintiff's activities on the dates in question were all undertaken at great length. Moreover, Det. Etter sought and obtained an arrest warrant from a neutral and detached Magistrate after presenting the facts to the District Attorney. No warrantless arrest occurred here. While the affidavit could have been drawn more precisely, and could have included more facts,

if everything Plaintiff refers to had been included, the evidence strongly established that there was probable cause to believe that the Plaintiff had committed the offenses alleged. As the Supreme Court observed in *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949): "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating ... often opposing interests." The information developed was reasonably trustworthy and would cause a prudent person to believe that Plaintiff committed the alleged offense. We believe that no conflict in substantial evidence can be found on this point. Therefore, on this full record, Defendants were entitled to a directed verdict on the question of probable cause, and now are entitled to JNOV on this issue.

 As to the issue of qualified immunity, both parties agreed that the issue of qualified immunity should be submitted to the jury. The jury's finding of qualified immunity is more than amply supported by this record. Indeed, the Defendants were entitled to a directed verdict on this issue, and this court could have taken the issue from the jury at the conclusion of Plaintiff's case. Having found that the evidence strongly established probable cause to arrest, it surely follows that the Defendants have established arguable probable cause, thereby entitling Defendants to the defense of qualified immunity as a matter of law. As the Supreme Court observed in *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987), "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... in such cases those officials ... should not be held personally liable." Surely on the full record presented at trial, a reasonable police officer in the same circumstances and possessing the same knowledge as Det. Etter possessed *could* have fairly believed that probable cause existed to arrest the Plaintiff. Measured by this standard, the Defendants were plainly entitled to a directed verdict

on the grounds of qualified immunity. At all events, the jury reached precisely that conclusion, and Plaintiff is not entitled to have that conclusion set aside. It is worth adding that the qualified immunity doctrine was meant to create immunity from suit rather than as a mere defense to liability. And like absolute immunity, the concept is undermined if a case is erroneously permitted to go to trial. Nevertheless, because of certain apparent contradictions in the record at the time motions for summary judgment were filed, and in order to develop a fuller and more complete trial record, we allowed the cause and all the operative facts to be fully ventilated at trial. At this time, however, we are clearly required by law to grant Defendants' Motion for JNOV.

■ Given the twin conclusions that probable cause existed as a matter of law, and that there was arguable probable cause and therefore qualified immunity, it may be unnecessary to consider Plaintiff's remaining contention that, since qualified immunity is not a defense to the pendent state law claims, this court erred in instructing the jury. We do, however, address this issue because Plaintiff's stipulation and agreement as to this point establishes, independent of a finding probable cause as a matter of law, that Plaintiff's post-trial motion must be denied. We observe at the outset that Plaintiff is indeed correct that qualified immunity is a defense only to a section 1983 claim, and not to the pendent state law claims. *See, e.g., Thompson v. City of Clio,* 765 F.Supp. 1066, 1075 n. 24 (M.D.Ala.1991) ("[Q]ualified immunity is not a defense to state law causes of action." (citing *Andreu v. Sapp,* 919 F.2d 637, 640 (11th Cir.1990))). However, it is equally clear that Plaintiff stipulated and agreed unambiguously and on more than one occasion that if the jury found qualified immunity, the inquiry was ended as to all claims, including the pendent state claims, and the jury would have to return a verdict in favor of the Defendants.

First, in a dialogue regarding Defendants' motion for a directed verdict that occurred immediately after Plaintiff had rested his case, the following exchange took place:

Def: "I believe we are all in agreement that if the 1983 action falls the rest fall along with it."

. . . . .

Jdg: "I take it there's agreement about that, Mr. Bujan?"

Pl: "If there was probable cause, everything fails."

J: "If the 1983 action fails then you could not recover on the other counts . . . You agree about that, do you not?"

. . . . .

J: "In other words, if a court or jury were to find either that there was probable cause *or qualified immunity,* then you could not sustain [the state law claims], right?"

P: *"Correct, your honor."*

J: ". . . He agrees that he could not lose the 1983 claim and then prevail on the others."

P: *"Yes sir."*

Transcription of Audio Tape, October 4, 1990 (emphasis added) (hereinafter "Tape"). Based on that unambiguous stipulation, the Defendants essentially put on no case. The Defendants were entitled to rely on Plaintiff's statement.

Thereafter, at a charging conference, in discussing the Verdict Form after both sides had rested, the court asked if either party had any objections to Question 2, which directed the jury to end its inquiry *if* it found qualified immunity. Both parties responded, "No your honor." Tape, Oct. 4, 1990.[7] The next morning, in a discussion

---

**7.** Specifically, Special Interrogatory number 2 reads as follows:

> 2. Was Defendant Gregg Etter acting in such a manner as to be protected by qualified immunity for his conduct?
> YES_ NO_

If the answer to Question Number Two is "YES" your verdict is for the Defendants and you should sign the Verdict Form and return to the Courtroom. If the answer to Question Number Two is "NO" proceed to Question Number Three.
*See* Appendix, p. 1.

immediately preceding closing arguments, in which the court went back over the jury charge and verdict form, asking the parties for final objections before closing arguments, the following dialogue ensued:

J: "It seems to me that qualified immunity is clearly a defense to the civil rights action; qualified immunity ... is not a defense to the state charges.... It's theoretically possible for [the jury] to find that there's no probable cause and yet find that there is qualified immunity; *could P than recover on the other claims?*"

D: "I think that theoretically they could, but remember that we tried this case with the stipulation that ... if for whatever reason the 1983 action falls the rest of the claims fall. I put on my defense based on this."

J: "Would you like to respond to what he said? * * * * Had you not agreed and are you not now changing that just before the case goes to the jury?"

P: *"Yesterday during the directed verdict motion, yes, I had agreed to that, last night."*

J: "I'm not changing it. I'm going to give the verdict form as said. I think it's wrong at this late hour to really just pull out from under. The verdict form will stand as is."

Tape, Oct. 5, 1990 (emphasis added).

Finally, immediately after Plaintiff's closing argument, the Court called for a sidebar again to discuss the issues raised by Question 2 of the Verdict Form, and noted that Plaintiff made no reference to the issue in his closing. The discussion at sidebar continued:

J: "... It seems to me as a technical matter that qualified immunity is not a defense to the pendent state charges. It can only be a defense to the civil rights charge, and it was not pled as an affirmative defense to the state charges.... I think the agreement was that if he loses on the civil rights claim he loses the whole ballgame but I think I said it is theoretically possible ... We didn't break it down ... for the jury to find that there was no

probable cause and answer the first question on the verdict form ... and they could say he was acting under qualified immunity at the same time. That would knock out the civil rights claim but I don't think it knocks out the other claims. My question is whether or not there was an agreement between the parties that qualified immunity ... fairly was a defense to the [other claims].... Give me your thoughts on this ... All that can be argued is that there was a stipulation or at least an agreement late last night ..."

D: "... We all agreed that should the 1983 action fall, the state actions fall as well.... You asked Mr. Bujan and he said yes.... *Because of that stipulation I put on the limited testimony I did as to the assault, battery, all of the pendent state actions* ...."

J: [to Bujan] "... What happened late yesterday when I asked you specifically, we went through the verdict form and you had no objection to question number 2.... It seems to me that counsel has the right to rely upon [your agreement].... You just changed your mind, do I have that right counsel?.... Didn't you agree to question 2 in this form?"

P: "Your Honor, I submitted a new verdict form this morning."

J: "I'm going to give the verdict form as we agreed to give the verdict form; I think you really did agree, Mr. Bujan, as to that matter.... He put on [a] barebones defense ... [and] the only explanation ... is that he was operating under [the agreement]."

Tape, Oct. 5, 1990 (emphasis added). As is clear from the above, Plaintiff agreed to the Verdict Form as submitted on a number of occasions, and, most notably, in reliance on Plaintiff's agreement and stipulation, the defense presented a barebones case. We are therefore constrained to conclude that Plaintiff has waived any objections regarding the issues contemplated by that stipulation. *See Manasota–88, Inc. v. Tidwell,* 896 F.2d 1318, 1322 n. 7 (11th

Cir.1990) (" 'A party is bound by the admissions and stipulations of his counsel absent a showing of manifest injustice.' " (quoting *Popham*, 820 F.2d at 1577 n. 2)). Additionally, there has been no showing of manifest injustice on this record. Moreover, we have found that in any event probable cause existed as a matter of law. On either grounds, the jury verdict must stand. Accordingly, it is

ORDERED AND ADJUDGED that Plaintiff's Motion for Judgment Notwithstanding the Verdict or in the Alternative for a New Trial is hereby DENIED, and Defendants' Motion for Judgment Notwithstanding the Verdict on the issue of probable cause is hereby GRANTED.

DONE AND ORDERED.

## APPENDIX
### *VERDICT FORM*

WE, THE JURY, return our verdict by answering the following questions:

1. Did the Defendant, Gregg Etter violate the Plaintiff, Roy Ramos' right under the Fourth Amendment to the United States Constitution to be free from an arrest that is not based on probable cause?

YES___✓___ NO_____

If the answer to Question Number One is "NO" your verdict will be for the Defendants. You should sign the Verdict Form and return to the Courtroom. If the answer to Question Number One is "YES" proceed to Question Number Two.

2. Was Defendant Gregg Etter acting in such a manner as to be protected by qualified immunity for his conduct?

YES___✓___ NO_____

If the answer to Question Number Two is "YES" your verdict is for the Defendants and you should sign the Verdict Form and return to the Courtroom. If the answer to Question Number Two is "NO" proceed to Question Number Three.

3. Do you find that the Defendants, Gregg Etter and the Sedgwick County Sheriff's Department, falsely imprisoned the Plaintiff, Roy Ramos?

YES_____ NO_____

4. Do you find that the Defendants, Gregg Etter and the Sedgwick County Sheriff's Department, assaulted the Plaintiff, Roy Ramos?

YES_____ NO_____

5. Do you find that the Defendants, Gregg Etter and the Sedgwick County Sheriff's Department, battered the Plaintiff, Roy Ramos?

YES_____ NO_____

6. Do you find that the Defendants, Gregg Etter and the Sedgwick County Sheriff's Department, maliciously prosecuted the Plaintiff, Roy Ramos?

YES_____ NO_____

7. If you find that the conduct of the Defendants, Gregg Etter and the Sedgewick County Sheriff's Department, respectively, have caused loss, injury or damage to Plaintiff, Roy Ramos, what amount of money, for each claim, do you find will fairly and adequately compensate him for such loss, injury or damage?

a. As to the claim for deprivation of constitutional rights against the Defendant, Gregg Etter.

$_____

b. As to the claim of false imprisonment against the Defendants, Gregg Etter and the Sedgwick County Sheriff's Department.

$_____

c. As to the claim of assault against the Defendants, Gregg Etter and the Sedgwick County Sheriff's Department.

$_____

d. As to the claim of battery against the Defendants, Gregg Etter and the Sedgwick County Sheriff's Department.

$_____

e. As to the claim of malicious prosecution against the Defendants, Gregg Etter and the Sedgwick County Sheriff's Department.

$_____

8. Do you find that the Defendant, Gregg Etter acted maliciously, wantonly, or oppressively such that punitive or exemplary damages should be awarded?

YES_____ NO_____

9. If the answer to Question Number 8 is "YES" what amount of punitive damages do you fix against the Defendant, Gregg Etter?